**ATCHISON, T. & S. F. RY. CO. et al. v. UNITED STATES ex rel. SONKEN– GALAMBA CORPORATION.**

No. 11062.

Circuit Court of Appeals, Eighth Circuit.

Oct. 23, 1939.

R. S. Outlaw, of Chicago, Ill., and Dean Wood, of Kansas City, Mo. (Lathrop, Crane, Reynolds, Sawyer & Mersereau, of Kansas City, Mo., G. B. Ross, of Galveston, Tex., Frank J. Wren, of Fort Worth, Tex., C. S. Burg, and Carl S. Hoffman, both of St. Louis, Mo., E. A. Neel, of Kansas City, Mo., G. H. Penland and Hobart Price, both of Dallas, Tex., and Charles J. Kelly, on the brief), for appellants and other defendants in the District Court.

Harry L. Jacobs and William G. Boatright, both of Kansas City, Mo. (Bernard L. Glover, I. J. Ringolsky, and Ringolsky, Boatright & Jacobs, all of Kansas City, Mo., on the brief), for appellee.

Before GARDNER, SANBORN, and WOODROUGH, Circuit Judges.

### GARDNER, Circuit Judge.

Appellee brought in the lower court a mandamus proceeding, authorized by Section 49, Title 49 U.S.C.A., against appellants, to compel appellant railroad companies to receive and carry certain steel and iron plates at the published tariff rate for steel and scrap. Appellee contended that the material consisting of old dismantled steel and iron oil tanks, should be classified for freight rate purposes as steel and scrap iron, while the appellants contended that it should be classified as steel and iron plate, the latter rate being much higher. The lower court granted the writ, and on appeal, this court, by its decision filed April 1, 1938, affirmed the judgment of the lower court. Atchison, T. & S. F. Ry. Co., et al. v. United States on the Relation of Sonken-Galamba Corporation, 8 Cir., 98 F.2d 457.

On July 14, 1939, appellants filed in this court their application for leave "to institute proceedings in equity in the United States District Court for the Western District of Missouri, Western Division, for relief against its mandamus judgment, etc." Their application is based upon the ground (1) that material evidence of very substantial secondhand commercial use of this material has been newly discovered that probably will change the result of another trial and which was not available at the time of the original trial, in the exercise of reasonable diligence; (2) that the mandamus judgment was obtained upon misrepresentations and fraud on the court by appellee Sonken-Galamba Corporation, in that it persuaded the court that less than one-half of one per cent of this material was used commercially secondhand, whereas in truth and in fact 50% or more of the material has been used commercially for secondhand uses.

Neither the application nor the petition filed with it, is verified, nor were any supporting affidavits filed or served on appellee, or its counsel, until the day of hearing, September 13, 1939, at which time two supporting affidavits were served upon counsel for appellee. One of these affidavits is by Fred A. Piehl, who does not state in his affidavit what relation he bears to the appellants, or either of them, but we have searched the original record and find that when the case was originally tried in the lower court, he was Assistant Manager of the Western Weighing and Inspection Bureau, one of the appellants, at Chicago. He states that at the request of appellants, he has had conducted an investigation to determine the total volume of movement by rail of steel plates from dismantled oil tanks originating in the section of the United States west of the Mississippi River during the period from January 1, 1936, to April 1, 1939, together with the use to which such steel plates were put after arriving at destination; that there has been a movement of approximately 2,388 carloads of such material during the period mentioned, of which 679 carloads were shipped by Sonken-Galamba Corporation, and 41 carloads by W. C. Berry, connected with the Sonken-Galamba Corporation; that as the result of his investigation, or the investigation made under his supervision, he states that approximately 42% of the total tonnage moved by rail has been used commercially for purposes other than remelting. The affidavit contains other detailed information. The statements are all based upon reports said to have been made to the affiant by investigators, and not from the personal knowledge of the affiant.

The other supporting affidavit is by Frank J. Wren, an attorney residing at Fort Worth, Texas. He states that for the last several months he has been representing the Atchison, Topeka and Santa Fe Railway Company in connection with the taking of depositions in a case pending in the Western District of Missouri between the same parties; that these depositions have been taken at various named places, concerning shipments of plates from dismantled oil tanks and the use made of such plates; that the depositions of witnesses whose depositions have thus far been taken show that approximately 9,250 tons of such material were exported through Pacific and Gulf points in the years 1936, 1937 and 1938, such shipments having been exported either to China or Japan; that the testimony does not disclose the ultimate use made of the material, except some 842 tons which were purchased for the purpose of being used in the erection of oil storage tanks in the Orient; that as to the shipments made to various points in the United States, the testimony reflects that a total of 30,667 tons had been used commercially; that an attempt is being made to secure information as to each shipment containing plates from dismantled oil tanks transported by rail in the territory west of the Mississippi River covering the period mentioned, and that an attempt will be made to establish by proof the ultimate use made of the plates contained in each of said shipments; "that if such proof is in accord with the information shown in the investigation so far made by the defendants, such proof will establish that more than 50% of the plates contained in such shipments have been sold and used commercially for the purposes other than remelting, and if the investigation now being conducted in the Orient finally discloses that a substantial part of the plates which were exported were not remelted, but were put to some other useful commercial purpose, then the proof will establish that in the neighborhood of 75% of all the plates from dismantled oil tanks which have been transported by rail in the territory west of the Mississippi River, beginning with the year 1936, have not been remelted, but have been put to other commercial uses in the place and stead of new steel;" that while an effort has been and is being made to determine the ultimate use of the plates in each of the shipments, the investigation necessitates interviewing a great many witnesses "and will take a great amount of time, and it is almost impossible to forecast when sufficient information will be developed concerning the use made of the plates contained in such shipments to enable the taking of testimony to establish such facts, but such investigation is being expedited as much as is humanly possible."

After the argument of the case, on leave of court, counter-affidavits were filed by the appellee. An affidavit by W. C. Berry points out that in the affidavits of Mr. Piehl and Mr. Wren, the figures and conclusions with reference to shipments of material are limited to the territory west of the Mississippi River, whereas there are shipments of like materials in large quantities in territory east of the Mississippi River, and that the greatest portion of such material is from states east of the Mississippi River; that if the essential figures based on movements of wrecked oil tanks originating east of the Mississippi River were included, the percentage of material actually used for remelting would be largely increased; that the commercial value of the material in question can not be fairly determined if territory east of the Mississippi River be excluded; that affiant testified at the trial of this suit below, that there were over 1,000,000 tons of this material available in four states alone, namely, Kansas, Oklahoma, Texas, and Wyoming, and that his testimony has not been challenged; that he also testified that not more than one-half of one per cent of such material had, during the five years preceding the trial, been used for other than remelting purposes; that the figures referred to in the affidavits of Mr. Piehl and Mr. Wren are limited to 1936, 1937 and 1938, one of which was prior to the trial and two of which were subsequent thereto, but that "even so, said affidavits indicate that only 30,667 tons of such material had been transported from points west of the Mississippi River and used commercially for purposes other than remelting in said three years;" that the use of such material in making culverts is almost unknown, and the use of such material for reerection purposes is trifling as compared with the total volume of the material held in the scrap yards in other places; that the supporting affidavits make no specific reference to the 22,000 tons involved in the mandamus judgment; that since the entry of judgment, a substantial part of this material has been sold and shipped to various customers, but a large quantity of it is still unsold and has long since been moved to

902

scrap yards, where it is stored with other scrap.

In a counter-affidavit by Oscar Berend it is stated that he testified at the trial that in his opinion wrecked oil tanks had value only for salvage purposes, to be purchased by someone engaged in the purchase of old material for junk, and there was no appreciable market or commercial value for any purpose other than junk; that the things stated in the affidavit of Mr. Piehl and Mr. Wren had no effect whatever on the fact that such material was of general commercial value only as scrap iron.

An affidavit by W. L. James is to the effect that he was an expert witness at the trial of this case, and that in his opinion nothing has happened in the oil business or in the commercial world since the time he gave his testimony, to change the conditions to which he testified, and that it is still his opinion that it is uneconomical to try to salvage old tank material for re-erection, and that the only possible outlet for same is through people who deal in salvage and junk.

Similar affidavits were made by H. A. Woodard, R. S. O'Brien, J. W. Jordan, and C. R. Walts. An affidavit by Fred Goodstein is to the effect that he maintains large scrap iron yards in both Casper and Denver; that he has been handling material obtained from wrecked oil tanks and that these tanks are in his territory obsolete; that there is practically no demand or use for same for any purpose except scrap iron; that from his experience and acquaintance with the trade in scrap iron, he states that this material has no recognized commercial value except for remelting purposes.

Both the supporting and counter affidavits contain argumentative matters, some of which is speculative in nature and not based upon any facts in the record.

We have treated this application as an application for permission to apply to the lower court for leave to file a bill of review. Rules relating to the practice in such matters have frequently been considered by this court. Obear-Nester Glass Co. v. Hartford Empire Co., 8 Cir., 61 F.2d 31; Hagerott v. Adams, 8 Cir., 61 F. 2d 35; Hagerott v. Adams, 8 Cir., 70 F.2d 352; Kithcart v. Metropolitan Life Ins. Co., 8 Cir., 88 F.2d 407; Simonds v. Norwich Union Indemnity Co., 8 Cir., 73 F.2d 412, 415.

Where, as here, the basis for the bill is newly discovered evidence, it is incumbent upon the applicant to show clearly and distinctly the facts claimed to constitute the newly discovered evidence. These facts should be supported by affidavits of witnesses competent to testify to them, so as to enable the court to determine whether the newly discovered evidence when produced will be material to the issue and of such character as probably to change the result. There must also be convincing proof that the parties seeking the review did not have any knowledge of the new matter set forth, at the time of hearing, or when the original decree was entered, and proof which convinces that such alleged facts could not, in the exercise of reasonable diligence, have been discovered. The remedy can be invoked only to prevent a miscarriage of justice. While the Court has the power to allow a bill of review, that power should be exercised cautiously and sparingly and only under extraordinary circumstances. It is in the interest of the public that there should be an end of litigation. As said by this court in Simonds v. Norwich Union Indemnity Co., supra: "Bills of review for newly discovered evidence are not favored by the courts. Their allowance rests upon a sound judicial discretion to be exercised cautiously and sparingly. It must be shown convincingly that the matter could not have been discovered or submitted in the exercise of reasonable diligence, and in time to be presented during the progress of the litigation now culminated in judgment or decree."

The so-called newly discovered evidence is with reference to the commercial value of these steel plates for reerection purposes. When this case was originally tried that was an issue of fact. It was apparently treated as an important issue by the appellee; at least, it produced a number of witnesses, based upon whose testimony the lower court in effect found that it had no substantial commercial value for that purpose. No act of the appellee prevented the appellants from introducing any evidence they cared to introduce on this question. Evidence on the question was as available to them as to the appellee. In the original opinion in this case, written by Judge Booth, it is said [98 F.2d 458]:

"The evidence is replete with statements that the material tendered for trans-

portation was 'old, worn-out, obsolete, broken, and cut iron or dismantled machinery, and parts thereof, entirely unfit for original use'.

"It is agreed by counsel that the material tendered had no commercial value except for remelting purposes."

No evidence on this issue was produced in the court below by the appellants. In this state of the record, we do not think they can at this late date be heard to say that they have newly discovered evidence, which, in the exercise of ordinary diligence, could not have been discovered at or prior to the time of trial. There is no showing whatever that any attempt was made to discover or produce such evidence, but on the other hand, counsel for appellants agreed in this court "that the material tendered had no commercial value, except for remelting purposes." The supporting affidavits do not state when, if at all, the appellants discovered this allegedly newly discovered evidence, nor is any attempt made to explain or excuse the failure to produce evidence on this issue. Newly discovered law can not be made the basis for a bill of review. Neither is the evidence of such probative force as to convince us that if introduced it would probably change the result.

It is also urged as a ground for permitting the filing of the proposed bill of review that the mandamus judgment was obtained upon misrepresentations and fraud on the court by the appellee. This charge is based upon the claim that the lower court was misled by the testimony of one of appellee's witnesses as to the percentage of this material which was used commercially secondhand. It is not claimed that by any fraudulent act of the appellee the appellants were prevented from having their day in court, or submitting proof on this issue. What they now claim is that the testimony of this witness, which was in its nature an estimate and an approximation, was erroneous. But, as already observed, it was conceded by counsel that the material had no commercial value except

for remelting purposes, and the counter-affidavits filed tend at least to support that admission. Upon this admitted fact, the issue involved was one of law. There are no definite facts alleged, either in the application, in the proposed petition, nor in the supporting affidavits, which conclusively overcome or impeach this testimony. The mere use of the terms "fraud," "misrepresentation," and "untrue testimony" can not be accepted as facts. In Smith v. Apple, 8 Cir., 6 F.2d 559, 563, this court, speaking by Judge Stone, said: " * * * when a party has a defense which he could have interposed, and is not prevented from so doing by fraud, accident or mistake, he cannot reserve that defense to some other time or forum and thus split up litigation. If he suffers through his negligent failure to interpose the defense at the proper time and in the proper court, it is from his own fault and he cannot ask relief therefrom in a court of equity."

As said by us in Kithcart v. Metropolitan Life Ins. Co., supra [88 F.2d 410]: "It was, of course, not the duty of defendant to prepare plaintiff's case for trial, nor to furnish him with evidence, at least without some request or demand so to do."

Fraud, to be available, must be extrinsic to the issues which were determined. Continental National Bank v. Holland Banking Co., 8 Cir., 66 F.2d 823; Kithcart v. Metropolitan Life Ins. Co., supra. Mere erroneous, or even perjured testimony, which relates simply to the issue directly contested, does not constitute extrinsic fraud. United States v. Throckmorton, 98 U.S. 61, 25 L.Ed. 93; Continental National Bank v. Holland Banking Co., supra.

There is neither adequate averment nor competent proof of newly discovered evidence. Neither has any actionable fraud been alleged, and the inadequate allegation is wholly unsupported by proof.

We are of the view that the application is wholly without merit. It is therefore denied.