**OFFICE OF PEOPLE'S COUNSEL, Petitioner,**

v.

**PUBLIC SERVICE COMMISSION OF the DISTRICT OF COLUMBIA, Respondent.**

Liberty Transportation Management Corporation, Abbey Casualty Insurance Company, Amalgamated Casualty Insurance Company, and Columbia Mutual Insurance Company, Intervenors.

No. 85–1203.

District of Columbia Court of Appeals.

Argued Feb. 19, 1986.
Decided Jan. 21, 1987.

---

Ruth R. Banks and Sandra Mattavous Frye, with whom Frederick D. Dorsey, People's Counsel, and Elizabeth A. Noel, Deputy People's Counsel, Washington, D.C., were on the brief, for petitioner.

John P. Gregg, with whom Roberta Willis Sims, Washington, D.C., was on the brief, for respondent.

Valerie J. Daye, with whom Wiley A. Branton, Washington, D.C., was on the brief, for intervenors Abbey Cas. Ins. Co., et al.

Jerry A. Moore, III, with whom Carolyn C. Olshaker, Washington, D.C., was on the brief, for intervenor Liberty Transp. Management Corp.

Before NEWMAN, TERRY, and ROGERS, Associate Judges.

TERRY, Associate Judge:

The Office of People's Counsel (OPC) appeals from two orders of the Public Service Commission authorizing Liberty Transportation Management Corporation (Liberty) to establish a sinking fund in lieu of insurance, pursuant to D.C. Code § 44–305(a)(2) (1981). OPC maintains that the Commission erred when it interpreted D.C. Code §§ 44–305 and 44–306 to permit Liberty, a holding company, to establish a sinking fund as a means of insuring 1438 taxicabs which it purports to own. OPC further contends that the methodology employed by the Commission for determining the amount of capitalization required for Liberty's sinking fund was not supported by substantial evidence. We hold that

OPC's first argument is correct as a matter of law, and therefore we do not consider the second.[1]

I

In March 1984 Andrew, Maurice, Gerald, and David Schaeffer filed a petition with the Public Service Commission requesting that they be permitted, through Liberty Management Company, Inc.,[2] to establish a sinking fund in accordance with D.C. Code § 44–305(a)(2).[3] Liberty is organized as a holding company. It owns all of the stock in three corporations—Cabs, Inc., Transco, Inc., and Cabco, Inc.—which in turn own twenty subsidiary taxicab companies. Each of the three parent corporations has organized its subsidiaries into two taxicab associations, which operate under individual trade names and color schemes. Thus six different color schemes and trade names are shared by the three parent and twenty subsidiary corporations. The six associations and their corresponding color schemes are: Liberty Cab Association (black and yellow) and Royal Cab Association (blue and white), both of which are operated by Cabs, Inc.; District Cab Association (black and silver) and Consolidated Cab Association (yellow and black), operated by Transco, Inc.; and American Cab Association (blue and black) and Checker Cab Association (yellow with checkered

1. The day before oral argument in this case, Liberty brought to the court's attention a recent enactment of the District of Columbia Council, the "District of Columbia Taxicab Commission Establishment Act of 1985," D.C. Act 6–125, 33 D.C.Reg. 703 (1986). Liberty asserts that this Act, which became D.C.Law No. 6–97 on March 25, 1986, see 33 D.C.Reg. 2145 (1986), makes the instant appeal moot because it repeals D.C.Code §§ 44–301 through 44–308 and, according to Liberty, resolves the primary issue in this case— the meaning of the word "owner" in D.C.Code § 44–305(a)(2)—in Liberty's favor. We reject Liberty's claim of mootness. The pertinent portion of the new law will not become effective until March 25, 1987, so that the issue raised by OPC will remain alive at least until then. Whether the new law thereafter will resolve the issue in Liberty's favor is a matter that we need not now decide.

2. The company was subsequently incorporated under the name "Liberty Transportation Management Corporation."

3. Section 44–305 states in pertinent part:
 (a) Any owner of a public vehicle required by this chapter to file a bond or policy of insurance may, in lieu thereof:
 * * * * *
 (2) Create and maintain a sinking fund in such amount as the Commission may require, but not to exceed $75,000, and deposit the same, in trust, for the payment of any judgment recovered against such owner, as provided in this chapter, with such person, official, or corporation as the Commission shall designate. Such sinking fund shall not be created unless the Commission is satisfied that such owner is possessed and will continue to be possessed of financial ability to pay judgment obtained against such owner.

stripes), operated by Cabco, Inc. Some taxicabs are owned by the twenty subsidiary companies; others are owned by individual drivers who have joined one of the six associations and operate under the trade names and color schemes of their respective associations. The sinking fund that Liberty proposed to establish would provide insurance coverage for all of the 1438 taxicabs owned by or associated with the parent and subsidiary corporations.[4]

In response to the petition, the Commission published a notice of proposed rulemaking in Formal Case No. 818. 31 D.C. Reg. 2234 (1984). Comments on Liberty's application to establish a sinking fund were filed with the Commission by OPC and Amalgamated Casualty Insurance Company, one of the intervenors in this appeal. No hearings, evidentiary or procedural, were ever held.

On May 6, 1985, the Commission issued Order No. 8232, which authorized Liberty to establish a sinking fund, albeit with certain modifications of its original proposal. The Commission determined the financial structure and capitalization required for Liberty's sinking fund. It also ordered Liberty to file a certificate of identity for its vehicles, as well as an admission of liability under the doctrine of *respondeat superior*. After its initial filings in response to this order were rejected, Liberty filed an amended certificate and an amended admission of liability. The record does not reflect whether the Commission accepted these filings.

OPC's motion for reconsideration of Order No. 8232 was denied in Order No. 8281. Pursuant to D.C.Code § 43–905 (1981), OPC seeks review of both orders.

**II**

OPC contends that the Commission erred as a matter of law when it approved Liberty's application to set up a sinking fund in lieu of insurance. D.C.Code § 44–305(a)(2) permits an "owner" of a public vehicle to create a sinking fund, and section 44–306 defines "owner" to include any "corporation, company, [or] association ... permitting ... its trade name and/or identifying design to be displayed upon vehicles governed by this chapter." Because the 1438 taxicabs purportedly owned by Liberty display the trade names and identifying designs (color schemes) of six different taxicab associations, OPC argues that these two sections, read together, require the creation of at least six sinking funds, one for each association. Liberty, according to OPC, is not entitled to establish a sinking fund under section 44–305(a)(2) because it is not an "owner," as that term is defined in section 44–306. That is, Liberty does not own any taxicabs, nor does it have a trade name or design; rather, it merely owns the stock of three corporations, which in turn own twenty cab companies that associate with one another under different trade names and identifying designs.

The Commission, on the other hand, maintains that it reasonably interpreted "owner" in section 44–305(a)(2) to mean the equitable or common law owner, and that Liberty, as sole shareholder of the three parent corporations, is the equitable owner of the trade names displayed on the 1438 taxicabs. The Commission further argues that it is entitled to great deference in its statutory interpretation, and that OPC has not carried its burden of demonstrating that any aspect of its decision was arbitrary or capricious, not in accordance with law, or contrary to public policy.

### A. *Scope of Review*

Because we "must accord great deference to the expertise and decisions of the Commission," our review of a Commission order is ordinarily quite limited. *D.C. Telephone Answering Service Committee v. Public Service Commission*, 476 A.2d

---

4. Liberty has two other subsidiary corporations, Allied Associates, Inc., and Auto Care, Inc. Allied was established as a District of Columbia corporation to engage in the business of buying and selling automobiles—mostly taxicabs—to the companies and/or drivers associated with Liberty. Auto Care performs body work on the taxicabs.

1113, 1118 (D.C.1984). Under D.C.Code § 43–906 (1981), this court's review is confined to "questions of law, including constitutional questions; and the findings of fact by the Commission shall be conclusive unless it shall appear that such findings … are unreasonable, arbitrary, or capricious." In this case we need not determine whether the Commission properly found that Liberty was financially capable of maintaining a sinking fund, or whether the methodology employed by the Commission to make that finding was proper. If and when those issues arise, our scope of review will be very narrow indeed. This appeal, however, presents only an issue of statutory construction, a clear question of law, as to which our scope of review is not so narrowly confined. *See Saah v. District of Columbia Board of Zoning Adjustment,* 433 A.2d 1114, 1116 (D.C.1981).

██ Of course, "[a]n agency's interpretation of a statute that it administers and enforces is controlling, unless it is plainly wrong or inconsistent with its legislative purpose." *Remin v. District of Columbia Rental Housing Commission,* 471 A.2d 275, 279 (D.C.1984) (citation omitted). Statutorily created exceptions and exemptions, on the other hand, "should be narrowly construed in light of the intent of the legislature and plain meaning of the legislation." *Id.* (citation omitted). The latter principle governs this case. Because section 44–305 (a) (2) creates an exception to the general requirement of section 44–301 that all taxicab owners purchase a minimum level of insurance, it must be narrowly construed. OPC's reading of section 44–305 (a) (2), although quite narrow and literal, appears consistent with both the plain meaning of the legislation and the intent of Congress in enacting it.

### B. Statutory Construction

It is undisputed that Liberty must be the "owner" of any taxicabs it seeks to insure by establishing and maintaining a sinking fund under D.C.Code § 44–305(a)(2). The Commission argues that because Liberty owns all the stock of the taxicab companies for which it proposes to provide insurance, Liberty equitably owns the taxicabs themselves, as well as the multiple trade names and identifying designs. According to the Commission, therefore, such equitable ownership qualifies Liberty as an "owner" within the meaning of D.C.Code § 44–305 (a) (2).

The Commission's argument ignores not only the plain language of the statute but long-established principles of corporate law as well. D.C.Code § 44–306 unambiguously provides that the trade name or identifying design appearing on the vehicle determines who its owner is: "owner" means any company "permitting … *its* trade name and/or identifying design to be displayed upon vehicles governed by this chapter" (emphasis added).[5] Thus whether Liberty is an "owner" under section 44–305 (a) (2) depends on whether it owns the trade names and designs displayed on the 1438 taxicabs.

██ In essence, Liberty answers the question in the negative by admitting that its ownership is equitable and not legal. As sole stockholder of the three parent companies, which in turn are the sole stockholders of the twenty subsidiaries, Liberty is unquestionably the equitable owner of all of those companies. *See, e.g., J.D.P. v. F.J.H.,* 399 A.2d 207, 210 n. 1 (Del.1979); *Buechner v. Farbenfabriken Bayer Aktiengesellschaft,* 38 Del.Ch. 490, 492, 154 A.2d 684, 686 (1959); 18A AM.JUR. 2d *Corporations* § 749 (1985). But it is well established that "because of the separate legal existence of a corporation, the corporate property is vested in the corporation

---

**5.** Section 44–306, in its entirety, states:

Within the meaning of this chapter, the word "owner" shall include any corporation, company, association, jointstock company or association, partnership or person, and the lessees, trustees, or receivers appointed by any court whatsoever, permitting his, their or its trade name and/or identifying design to be displayed upon vehicles governed by this chapter.

itself and not in the stockholders...." *Id.* Thus "a corporation's property rights are entirely distinct from those of its shareholders...." *Boise Cascade Corp. v. Wheeler,* 419 F.Supp. 98, 101 (S.D.N.Y. 1976), *aff'd,* 556 F.2d 554 (2d Cir.1977).

[S]hares of stock do not have any specific or aliquot interest in the assets of the corporation. The shareholder has essential rights to share in the profits and in the distribution of assets on liquidation, but no specific interest in the corporate assets.

*duPont v. duPont,* 42 Del.Ch. 246, 250, 208 A.2d 509, 512 (1965) (citations omitted); *see also First National Bank v. Maine,* 284 U.S. 312, 329–330, 52 S.Ct. 174, 177–78, 76 L.Ed. 313 (1932), *overruled on other grounds, State Tax Comm'n v. Aldrich,* 316 U.S. 174, 181, 62 S.Ct. 1008, 1011, 86 L.Ed. 1358 (1942); *Klein v. Board of Tax Supervisors,* 282 U.S. 19, 23, 51 S.Ct. 15, 15, 75 L.Ed. 140 (1930); *Rhode Island Hospital Trust Co. v. Doughton,* 270 U.S. 69, 81, 46 S.Ct. 256, 258, 70 L.Ed. 475 (1926); *Eisner v. Macomber,* 252 U.S. 189, 208, 40 S.Ct. 189, 193, 64 L.Ed. 521 (1920); *Angle v. Chicago, St. P., M. & O. Ry.,* 151 U.S. 1, 15, 14 S.Ct. 240, 245, 38 L.Ed. 55 (1894); *W.A. Sheaffer Pen Co. v. Lucas,* 59 App. D.C. 323, 325, 41 F.2d 117, 119 (1930); *Owens v. Commissioner,* 568 F.2d 1233, 1238–1239 (6th Cir.1977); *Stewart Coach Industries, Inc. v. Moore,* 512 F.Supp. 879, 888 (S.D.Ohio 1981); *Buechner, supra,* 38 Del.Ch. at 492–95, 154 A.2d at 686–687; *Bird v. Wilmington Society of Fine Arts,* 28 Del.Ch. 449, 464, 43 A.2d 476, 483 (1945); *In re Estate of Mellott,* 1 Kan.App.2d 709, 718, 574 P.2d 960, 969 (1977). Even if stock ownership is concentrated in the hands of one person, it does not alter the fact that title to the corporate property is vested in the corporation and not in the owner of its stock. *Boise Cascade Corp., supra,* 419 F.Supp. at 101–102; *In re Boittnott,* 4 Bankr. 119 (Bankr.W.D.Va.1980); 18A AM. JUR.2d *Corporations* § 750 (1985). Finally:

Ownership of stock by one corporation in another does not ... create an identity of corporate interest between the two companies, nor render the stockholding company the owner of the property of the other. Even complete ownership of all outstanding stock of a corporation is not the equivalent of ownership of a subsidiary's property or assets, because a parent and subsidiary comprise two wholly separate entities with individual property rights, no transfer of title to corporate property taking place.

*Id.* at § 751 (footnotes omitted).

■ Thus we hold that Liberty has no legal interest in the 1438 cabs which are at issue in this case, even though Liberty's three wholly owned subsidiaries are the sole stockholders of all twenty of the taxicab companies which in turn own most of the cabs.[6] The individual trade names and identifying designs are the sole property of the three subsidiary companies, which have set up the six taxicab associations, and the cabs themselves—those which are not individually owned by their drivers—are the sole property of the twenty sub-subsidiary companies. *See Boise Cascade Corp. v. Wheeler, supra,* 419 F.Supp. at 101–102; 18A AM.JUR.2D *Corporations* § 750 (1985). This means, for example, that Liberty cannot convey title to, or otherwise dispose of, the taxicabs owned and operated by Sunshine Cab Company, a subsidiary of Cabs, Inc. Should Sunshine Cab be dissolved or go into bankruptcy, Liberty would have no rights in any of its property. Even if Sunshine's parent company, Cabs, Inc., which is wholly owned by Liberty, went bankrupt, Liberty would be entitled only to share in the proceeds of liquidation with Cabs, Inc.'s creditors, but it would have no legal right to any of Cabs, Inc.'s corporate assets. *See, e.g., duPont v. duPont, supra,* 42 Del.Ch. at 250, 208 A.2d at 512; *Bird, supra,* 28 Del.Ch. at 464, 43 A.2d at 483.

Furthermore, if Liberty were to sell all of its stock in its three subsidiaries to a third party, it would then have neither le-

---

**6.** In some instances the cabs are the personal property of their respective drivers.

gal nor equitable ownership of the trade names and designs, though it would still be operating the sinking fund. Legal title to the corporate assets of Liberty's subsidiaries would remain unchanged; "transfer of the stock of a parent corporation does not affect the ownership of assets held by a subsidiary." 18A AM.JUR.2D *Corporations* § 749 (1985) (footnote omitted). The transferee of the stock would be possessed of the same interest in the taxicab companies that Liberty now has: equitable, but not legal, ownership.

This brief excursion into some of the rudiments of corporate law makes the plain meaning of D.C.Code §§ 44–305 (a) (2) and 44–306 all the more plain. These two sections, read together, must mean that the corporate "owner" of a vehicle, entitled to establish a sinking fund in lieu of insurance, can only be the corporation that legally owns either the vehicle itself or the trade name and design displayed on that vehicle, or both. The Commission's contrary interpretation cannot withstand scrutiny.

Moreover, the Commission's own regulations relating to taxicab insurance and sinking funds make no reference to equitable or beneficial interests in their definition of an "owner." 15 DCMR § 999.1 (1985) defines an owner, with two exceptions not pertinent here, as "any corporation, company, association, joint-stock company or association, partnership, or person, their lessees, trustees or receivers appointed by any court whatsoever, *operating, controlling, managing, or renting* any passenger motor vehicle for hire in the District of Columbia ..." (emphasis added). Liberty, as a mere holding company for the stock of its subsidiaries, does not operate, control, manage, or rent any taxicabs; rather, all 1438 taxicabs are owned and operated by

its subsidiaries (actually, its sub-subsidiaries) or by private owners who use the trade names and colors of the six associations. Liberty's equitable interest does not even meet the criteria of ownership set forth in the Commission's regulations.[7]

In short, because Liberty does not legally own either the taxicabs or the trade names and identifying designs, it is not an "owner" within the meaning of D.C.Code § 44–305 (a) (2). Unless it either becomes the legal owner of the taxicabs themselves or establishes its own identifying design and trade name and displays them uniformly on all 1438 taxicabs, it cannot be deemed an "owner" under the Code. Until one of these things happens, Liberty cannot establish a sinking fund under section 44–305 (a) (2) in lieu of insurance for those 1438 cabs.

### C. *Public Policy*

 The Commission argues that its ruling is in accord with the intent of Congress in enacting section 44–301, which is to protect the public from uninsured taxicabs, and that its authorization of a sinking fund will not adversely affect a claimant's ability to ascertain the identity of Liberty as the cab company's insurer. The Commission required Liberty to file a current list of taxicabs covered by its sinking fund, pursuant to 15 DCMR § 900.7 (1985). It also ordered Liberty to comply with 15 DCMR § 811.4 (1985), which requires every taxicab "company" to file (1) a certificate of identity, stating *inter alia* the address and telephone number of the company; (2) a copy of the company's certificate of incorporation; (3) copies of by-laws and other company rules and regulations; and (4) the fleet number, make, year, and serial number of all the taxicabs it owns, as well as the names and addresses of the private

---

7. Another regulation, 15 DCMR § 899.1 (1985), defines "owner" as "any person having legal or equitable title to a taxicab." This definition, however, is not relevant to the use of that word in D.C.Code § 44–305 (a) (2), because chapter 800 of the regulations, of which section 899.1 is a part, applies to the general operation of all taxicabs in the District of Columbia, whereas chapter 900, of which section 999.1 is a part, relates specifically to taxicab insurance, the subject of this litigation. To the extent that the two regulations conflict, therefore, section 999.1 must prevail. Even the Commission admits that it did not rely on the definition of "owner" in section 899.1 in rendering its decision. Nor do we, concluding instead that section 899.1 is of no assistance in determining the meaning of "owner" in D.C.Code § 44–305 (a)(2).

owners of taxicabs that are part of its fleet.

The Commission fails to recognize, however, that Liberty cannot be made to comply with section 811.4 because it is not a "company" within the meaning of that provision. The word "company" is defined, for purposes of section 811.4, as "any person, partnership or corporation owning a fleet of taxicabs *having a uniform color scheme.*" 15 DCMR § 899.1 (1985) (emphasis added). The Commission's own regulations require a uniform color scheme for all taxicabs reporting under the umbrella of a single company. The companies that Liberty equitably owns operate under six different color schemes; hence Liberty is not a "company" within the meaning of the regulation.[8]

Only two other companies have been permitted to set up sinking funds in lieu of insurance: Capitol Cab Cooperative Association, Inc., and Diamond Cab Company, Inc. Like Liberty, neither company holds legal title to all the taxicabs covered under its sinking fund. However, each of the cabs covered by Capitol's and Diamond's sinking funds bears the trade name and design of Capitol or Diamond, the company through which the cab receives coverage. In each case, therefore, there is just one trade name and one identifying design, which makes possible one sinking fund under the aegis of one company.

■ The Commission further confuses the matter by stating in its brief that D.C. Code § 44–305 (b) "requires a sinking fund

operator to file an admission of liability in conformity with the principle of *respondeat superior.* Liberty has done so.... This could create liability for the entire corporation." But the common law doctrine of *respondeat superior* cannot make Liberty liable in tort for the negligent acts of its subsidiaries' employees. Under that doctrine, a master is liable in certain instances for the wrongful acts of his servants, and a principal is liable for the wrongful acts of his agents. *See, e.g., Burger Chef Systems, Inc. v. Govro,* 407 F.2d 921, 925 (8th Cir.1969). Liberty, however, is neither a master nor a principal. It does not employ the taxicab drivers; they are employed by the subsidiary taxicab companies, or else they are independent contractors. Thus, for example, if a Sunshine Cab Company driver negligently caused injuries to a plaintiff, only Sunshine would be subject to liability under the doctrine of *respondeat superior.* That Liberty owns the stock of Cabs, Inc., the parent company of Sunshine, cannot make Liberty liable unless the plaintiff can pierce the corporate veils of both Sunshine Cab Company and Cabs, Inc.[9]

The trade name and color scheme displayed on a taxicab denote the apparent owner of that cab to the public. *See Callas v. Independent Taxi Owners' Ass'n,* 62 App.D.C. 212, 66 F.2d 192, *cert. denied,* 290 U.S. 669, 54 S.Ct. 89, 98 L.Ed. 578 (1933) (vehicle, operating as a taxicab and bearing distinctive colors and trade name of defendant company, is presumed to be in

---

**8.** A different regulation, 15 DCMR § 811.3 (1985), imposes similar reporting requirements on taxicab associations. We assume, without deciding, that each of the six associations controlled by Liberty's subsidiaries must comply with section 811.3.

**9.** Liberty's amended admission of liability states in pertinent part:

Liberty Transportation Management Corporation, by and through its President, Andrew Schaeffer, hereby admits the liability of the Liberty Sinking Fund for the tortious acts of the driver or drivers of any vehicle or vehicles for which it provides insurance.

As far as we can discern from the record, the Commission never found that Liberty had com-

plied with the requirement of filing a current and accurate certificate of identity for all its vehicles. In any event, this amended admission of liability, at most, can subject Liberty to liability only for the torts of the drivers whose cabs it insures. Since the only way of knowing whose cabs it insures is through the listing in the certificate of identity, the admission is insufficient to "create liability for the entire corporation," as the Commission argues. Furthermore, it is by no means certain that the amended admission, limiting Liberty's liability to the amount of the sinking fund, can subject "the entire corporation" to liability.

the custody and doing the business of that company); *Rhone v. Try Me Cab Co.,* 62 App.D.C. 201, 65 F.2d 834 (1933) (cab company estopped to deny liability to a passenger injured by negligence of cab driver, when cab displayed the name of the company at the time of the accident). Permitting Liberty's sinking fund to insure taxicabs bearing multiple trade names and color schemes would undoubtedly make it more difficult for a person injured by the act or omission of a cab driver to recover from the responsible party or corporate entity, especially when the injured person fails to get the name of the driver or the license number of the cab. Such information is usually provided by insurance company investigators; according to OPC, a commercial insurer's administrative expenses include the cost of investigation, and an insurance company would be estopped from denying liability when the plaintiff knew the trade name, color, and cab number, but not the driver's name or license number. *See Rhone v. Try Me Cab Co., supra.* Under a sinking fund arrangement, however, the burden of investigating an accident is more likely to be placed on the injured claimant, so that an accident victim would have to bear the cost of tracking down the "insurer" of a negligently driven taxicab in order to recover from the sinking fund. The record fails to support the Commission's argument to the contrary. Whether the Commission's order would alleviate this burden on the public and place it on Liberty is at best unclear, even if Liberty were to comply fully with all of the Commission's directives.

The purpose of D.C.Code § 44–301, which requires all taxicabs operating in the District of Columbia to carry insurance, is to protect the public from uninsured taxicabs. *See* H.R.Rep. No. 1194, 75th Cong., 1st Sess. 1–2 (1937). Section 44–305 is an exception to that requirement. It provides that certain cab companies and associations that display a single trade name and uniform color scheme may, if the Commission approves, set up a sinking fund in lieu of insurance. The Commission's order in this case, however, allows Liberty's fund to insure twenty cab companies operating under six different trade names and color schemes. This arrangement, in our view, does not comport with the statute and the legislative history. It evades the plain meaning of D.C.Code § 44–306; it permits Liberty to function as an insurance company without complying with legal requirements;[10] and it makes recovery potentially more difficult for injured victims. We hold that the Commission, in approving Liberty's sinking fund, has exceeded its authority and has given Liberty an impermissible short cut into the insurance business. Even under a very broad reading of the statutory scheme, this result could not reasonably have been contemplated by Congress when it enacted D.C.Code § 44–305.

### III

For the foregoing reasons, we reverse both of the orders under review. We remand this case to the Commission with directions either (1) to require all of the taxicabs covered by Liberty's sinking fund to obtain insurance coverage as required by D.C.Code § 44–301, or (2) to consider the establishment of a separate sinking fund for each taxicab association that operates under a single trade name and uniform color scheme. If the Commission chooses the latter option, each of the six

10. Liberty vigorously denies—no doubt with strong motivation—that it is operating as, or is functionally equivalent to, an insurance company. In the District of Columbia, casualty insurance companies must pay certain taxes and fees, including a two percent tax on all policy and membership fees and premiums. D.C.Code §§ 47–2603, 47–2606, 47–2608 (1986 Supp.). They must comply with a strict consumer protection statute, D.C.Code § 35–2109 (1986 Supp.). They must also be members of the District of Columbia Insurance Guaranty Association, D.C.Code § 35–1904 (1981), which imposes certain obligations on all its members. The premium rates of any insurer of taxicabs are subject to regulation by the Superintendent of Insurance. D.C.Code § 44–302 (b) (1981). *See also* 15 DCMR § 905 (1985). Sinking funds are subject to none of these provisions.

associations must demonstrate to the Commission's satisfaction that it is capable of maintaining a sinking fund that will adequately protect the public. If an association can make such a showing, then the Commission may authorize it to set up a sinking fund, provided all other statutory and regulatory requirements are met. Any association which cannot make such a showing must obtain insurance pursuant to D.C.Code § 44–301.

*Reversed and remanded.*