Steven Z. LAUFER, Appellant,

v.

WESTMINSTER BROKERS,
LTD., Appellee.

No. 86–831.

District of Columbia Court of Appeals.

Argued April 22, 1987.
Decided Oct. 19, 1987.

William E. Rollow, for appellant. William W. Taylor, Washington, D.C., also entered an appearance for appellant.

Richard J. Medalie, with whom Alvin Friedman, Washington, D.C., was on brief, for appellee.

Before BELSON and TERRY, Associate Judges, and NEBEKER, Associate Judge, Retired.*

TERRY, Associate Judge:

On April 3, 1985, a judgment was entered against Steven Laufer in favor of Westminster Brokers, Ltd., a British corporation, by the High Court of Justice, Queen's Bench Division, in London, England. The judgment was in the amount of $173,062.99 (or the sterling equivalent at time of payment) plus costs. A few weeks later Westminster filed suit in the Superior Court of the District of Columbia to enforce the English judgment.[1] In due course the Superior Court granted Westminster's motion for summary judgment on its claim, dismissed

Laufer's two counterclaims, and entered final judgment for Westminster in the full amount of the English judgment, plus interest from the date of the English judgment, costs in the English proceeding, and costs in the American proceeding. We affirm the judgment of the Superior Court in all respects.

## I. FACTUAL BACKGROUND [2]

In early 1982 appellant Laufer was attempting to purchase a luxury resort hotel in Jamaica known as Dragon Bay. In an effort to raise capital, he met in London with J.B. Meachem, a solicitor representing Westminster Brokers, Ltd., a British corporation engaged in the buying and selling of business opportunities. Laufer agreed to pay Westminster a commission of five percent, plus expenses reasonably incurred, for Westminster's services in finding investors. Westminster agreed, in turn, to seek an investor who would supply the $3.5 million which Laufer needed to complete his purchase of Dragon Bay by June 30, 1982. The financing was to be secured by a first mortgage on the hotel property.[3] Westminster was unable, however, to find anyone who could provide this amount by June 30; consequently, Laufer had to pay the sellers of Dragon Bay $250,000 to extend the time for closing the sale.

Finally, in December 1982, Westminster notified Laufer that it had located two potential investors, Prince Alfonso Hohenlohe and Thomas Elek, both of whom were principals of International Marbella Club, S.A. ("IMC"), a Liechtenstein corporation. Westminster portrayed IMC as a highly

---

* Judge Nebeker was an Associate Judge of this court at the time of oral argument. His status changed to Associate Judge, Retired, on September 1, 1987.

1. Laufer is a resident of the District of Columbia.

2. Our summary of the facts is based on various documents in the record, including the pleadings, two affidavits by Laufer, and the several contracts which underlie this litigation.

3. The contract between Westminster and Laufer is embodied in a letter dated May 12, 1982, signed by Mr. Meachem and countersigned by

Mr. Laufer. This contract was amended by an "Agreement and Charge" dated July 21, 1983, and again by a letter dated August 2, 1983, but neither amendment made any change affecting the five percent commission to be paid by Laufer to Westminster. The July 21 document, which Laufer signed both in his own behalf and as representative of two corporations, acknowledged that Laufer owed $162,500 to Westminster and another British corporation, Robert Fraser International, Ltd., under the terms of the original contract. Laufer later paid $23,400 of this amount to Westminster, leaving the remainder due and owing.

experienced, financially stable owner and manager of luxury hotels throughout the world, including the Marbella Club in Marbella, Spain, the Marbella Club in Manila, the Philippines, and the Marbella Club in Sharjah, United Arab Emirates. Laufer alleged below that he agreed to do business with IMC in reliance on Westminster's representations concerning IMC's financial stability and its experience in hotel management. In addition, he secured the participation of Financial Services, Inc. ("FSI"), a Virginia corporation of which he is the sole beneficial owner. FSI is the parent company of a wholly owned subsidiary, SSI (Cayman), Inc. ("SSI"), a Cayman Islands corporation. Once the purchase of Dragon Bay was completed, title to the hotel was to be vested in SSI.

On February 22, 1983, Laufer and IMC entered into a fifteen-page investment and management contract for Dragon Bay. Included in this contract was a provision that IMC would lend FSI $3.2 million, to be secured by a first mortgage on the property.[4] IMC was given the exclusive right to manage Dragon Bay for ten years as well as a one-year option to purchase what amounted to half of SSI. Laufer and SSI agreed to guarantee full repayment of the loan, with interest, but Laufer's guarantee was subject to a fifty percent reduction in the event that IMC exercised its option.[5] On March 30, after other implementing agreements were completed, IMC disbursed the money to FSI, which turned it over to its wholly owned subsidiary, SSI, in order to complete the purchase of Dragon Bay.

Westminster then sought to collect the five percent commission that Laufer owed it under their earlier contract. Laufer, "while denying that he had any precise legal obligation, nonetheless agreed he had a moral obligation to pay a reasonable com-

mission."[6] Accordingly, on July 21, 1983 (see note 3, *supra*), Laufer agreed to pay Westminster $162,500.[7] In December 1983 he made a partial payment of $23,400.

Meanwhile, back at Dragon Bay, the situation began to deteriorate rapidly. IMC proved to be utterly inept at managing the hotel, which had less than fifteen percent occupancy, substandard service, and no comprehensive marketing plan. Furthermore, IMC failed to provide Laufer with a financial statement by the agreed-upon date. When the statement finally appeared, it revealed that IMC had no assets, owned no hotels, and was managing only one Marbella Club (in the United Arab Emirates), which was operating at a loss. Consequently, Laufer refused to pay Westminster any more money.

Westminster then sued Laufer on the contract in the London court. Laufer was personally served, was represented in court by London counsel, and defended against Westminster's claim on the merits. On April 3, 1985, the court entered judgment against Laufer for $173,062.99 ($160,000 plus interest) and costs. Laufer did not note an appeal in the English courts, nor did he take action to stay the proceedings or to set aside the judgment based on any alleged fraud by Westminster.

When Westminster sought enforcement of its English judgment in the Superior Court of the District of Columbia, Laufer asserted in defense that the judgment had been obtained by fraud. With his answer raising this defense he filed two counterclaims against Westminster alleging the same fraud, which he said he had not discovered until after the English judgment had been entered. Judge Kessler of the Superior Court granted Westminster's motion for summary judgment on its complaint, ruling that Laufer's claim was one

---

**4.** This agreement states on its first page that it is between Laufer and IMC. Laufer signed it, however, as "Steve Z. Laufer, for himself, FSI Financial Services Limited, FSI Jamaica Limited and FSI Financial Services U.S., Inc."

**5.** Although the record is not entirely clear, it does not appear that IMC ever exercised the option.

**6.** Laufer affidavit of June 29, 1985, ¶ 10(a).

**7.** This figure appears to be the sum of $160,000 (five percent of $3.2 million) and, presumably, $2,500 in expenses.

of intrinsic fraud, which would not justify a refusal to enforce the English judgment.[8] The judge concluded that Laufer should have either raised his claim of fraud in the English proceedings as a defense to Westminster's action on the contract or returned to the English courts and moved to set aside the judgment.

About two months later, Judge Kessler also entered an order dismissing Laufer's counterclaims. In the meantime, however, Laufer had moved for leave to file an amended answer and counterclaim. Judge Kessler, although expressing "substantial doubt about the viability of [Laufer's] counterclaims," granted him leave to file. Westminster then moved to dismiss the amended counterclaims under Super.Ct. Civ.R. 12(b)(6), and Judge Nunzio granted that motion. After an appeal by Laufer was dismissed as premature,[9] Judge Hannon entered a final judgment in favor of Westminster.

## II. LAUFER'S DEFENSE TO WESTMINSTER'S CLAIM

■ Both parties agree that the only type of fraud that may justify non-enforcement of an otherwise valid judgment of any court of competent jurisdiction, including a foreign court, is extrinsic fraud.[10] This principle was established more than a hundred years ago in *United States v. Throckmorton*, 98 U.S. (8 Otto) 61, 25 L.Ed. 93 (1878). The United States filed suit in *Throckmorton* to set aside two judgments on the ground that they had both been obtained by fraud. The Supreme Court, in affirming the dismissal of the suit, held that "many rights originally founded in fraud become ... no longer open to inquiry in the usual and ordinary methods."

Of this class are judgments and decrees of a court deciding between parties before the court and subject to its jurisdiction, in a trial which has presented the claims of the parties, and where they have received the consideration of the court.

*Id.* at 65. After giving several examples of the types of fraud which would justify setting aside a judgment, all of them involving fraud or deception in the conduct of the litigation itself, rather than fraud affecting the merits of the underlying claim, *id.* at 65–66, the Court announced the general rule which has been followed in countless cases ever since:

[T]he acts for which a court of equity will on account of fraud set aside or annul a judgment or decree, between the same parties, rendered by a court of competent jurisdiction, have relation to frauds, extrinsic or collateral, to the matter tried by the first court, and *not to a fraud in the matter on which the decree was rendered.*

*Id.* at 68 (emphasis added); *accord, e.g., Berman v. Diamond,* 90 U.S.App.D.C. 327, 328, 196 F.2d 590, 591 (1952) (distinguishing between "fraud in the transaction upon which the New York action was based" and "fraud practiced upon the New York court in the judicial process").

■ Laufer asserts that Westminster led him to believe that IMC was "an experienced, financially stable, internationally renowned operator and owner of luxury hotels," which was not true, and that because of these misrepresentations he was prevented from fully arguing and defending his case on the merits in the English court. Thus, he argues, this is a case of extrinsic fraud because there was no "real con-

---

**8.** Judge Kessler also ruled that Laufer had "fail[ed] to make an adequate factual proffer" to support his allegation that he had not discovered the supposed fraud until after the entry of judgment by the English court. *See Atchison, T. & S.F. Ry. v. United States,* 106 F.2d 899, 902 (8th Cir.1939). She did not base her grant of summary judgment on this failure, however, but on her conclusion that "the defense [of fraud] fails as a matter of law."

**9.** *Laufer v. Westminster Brokers, Ltd.,* No. 86–86 (D.C. March 10, 1986) (unpublished order).

**10.** The recognition by our courts of judgments from the courts of foreign countries, of course, is based entirely on principles of comity, not on any constitutional requirement of full faith and credit. *Butler v. Butler,* 239 A.2d 616, 618 (D.C. 1968).

test"[11] in the Queen's Bench proceeding. Judge Kessler held, however, and we agree, that the fraud which Laufer alleged as a defense below was intrinsic fraud, because he asserted only that Westminster had fraudulently withheld certain information on which he could have relied to defend against Westminster's action on the contract. Laufer's claim that Westminster " 'withheld' facts amounts to nothing more than a complaint that [Westminster] did not help [him] prove [his] case, and this certainly does not amount to 'extrinsic' fraud by any of the traditional definitions." *Goodwin v. Home Buying Investment Co.*, 352 F.Supp. 413, 415 (D.D.C.1973) (citation omitted).

> In litigation one of [the constraints on the parties] is that the adversaries may not resort to fraud; but that ... is a conclusion rather than a standard. It would be psychologically unrealistic, given the adversary setting, to call a failure to go out of one's way to produce damaging documents a "fraud" on opposing counsel and so, perhaps, on the court.

*USM Corp. v. SPS Technologies, Inc.*, 694 F.2d 505, 509 (7th Cir.1982), *cert. denied*, 462 U.S. 1107, 103 S.Ct. 2455, 77 L.Ed.2d 1334 (1983).

We hold that the English judgment must be enforced, despite Laufer's allegations of fraud, because the fraud alleged was an intrinsic fraud in the transaction upon which the English action was based, not a fraud practiced upon the English court in the judicial process. *Berman v. Diamond,*

*supra.* "Public policy as announced in the *Throckmorton* case, *supra,* demands that there be an end to litigation and decrees that a final judgment shall not be set aside for intrinsic fraud." *Dowdy v. Hawfield,* 88 U.S.App.D.C. 241, 242, 189 F.2d 637, 638, *cert. denied,* 342 U.S. 830, 72 S.Ct. 54, 96 L.Ed. 628 (1951);[12] *accord, Novak v. Novak,* 212 A.2d 341, 342 (D.C.1965).

### III. LAUFER'S COUNTERCLAIMS

With his answer Laufer filed two counterclaims against Westminster, one for fraud and one for breach of fiduciary duty. When these were dismissed, he filed two amended counterclaims which were essentially the same as the originals, the only significant change being a new allegation that Laufer "was personally damaged by reason of the judgment of $173,062.99 fraudulently obtained against him in the London Court, together with the tremendous cost of litigation...." In both the original and the amended versions, Laufer stated that Westminster had made a number of fraudulent representations concerning IMC's business experience and reputation. Laufer alleged that he had relied on these representations, heeded Westminster's advice, and entered into a series of agreements with IMC. As a result, he said, he had suffered losses in excess of two million dollars because he had pledged Dragon Bay, in which he had invested more than two million dollars of his own funds, as security for those debts incurred by FSI.[13] The trial court dismissed both sets

**11.** *Throckmorton, supra,* 98 U.S. at 66 (8 Otto).

**12.** In *Unger v. Unger,* 174 A.2d 84, 85–86 (D.C. 1961), this court held that a husband's failure, in a divorce proceeding, to reveal that he was bigamously married to another woman "was not the type of fraud necessary to set aside a judgment," citing in a footnote the *Throckmorton* and *Dowdy* cases. We recently held in *Tate v. Equity Brokerage Corp.,* 506 A.2d 201 (D.C. 1986), that *Unger* and *Dowdy* were no longer controlling authority, but only because the challenge to the earlier judgment in *Tate* (as in *Unger* and *Dowdy* ) was made in the original proceeding, in a motion filed under Super.Ct. Civ.R. 60(b)(3). That rule, as now worded, draws no distinction between intrinsic and extrinsic fraud. *Tate* has no application to a collateral attack on a judgment, either in an inde-

pendent action to set the judgment aside or, as in the case at bar, in an action to enforce a judgment issued by another court in which fraud is raised as a defense. In such circumstances *Throckmorton* controls, and "the troublesome distinction between intrinsic and extrinsic fraud must be faced." 7 J. MOORE & J. LUCAS, MOORE'S FEDERAL PRACTICE ¶ 60.24 [1], at 60–206 (2d ed. 1985).

**13.** In his brief Laufer describes Dragon Bay as "his most valuable asset." This is legally erroneous. Once the purchase of Dragon Bay was completed, title to the property was vested in SSI, not in Laufer. Thus Dragon Bay is not one of Laufer's assets at all. The fact that he owns most of the stock in FSI, which in turn owns all of the stock in SSI, does not make him the owner of Dragon Bay. "Even if stock owner-

of counterclaims, essentially on the ground that Laufer lacked standing to assert them because he had suffered no injury; the corporate entities, FSI and SSI, were the real parties in interest. On appeal Laufer challenges the dismissal of both the original and the amended counterclaims.

### A. *Standing*

We agree in part with the trial court that Laufer lacks the requisite standing. Laufer maintains that he has standing to bring the counterclaims because he has suffered a personal injury, in that Westminster's fraud caused him to enter into the February 1983 contract with IMC, which bound him personally as a guarantor of the debts and obligations of FSI and SSI.[14] Moreover, he claims that he stands to lose not only the broker's fee for which he was held liable to Westminster in the English suit, but also Dragon Bay itself, and perhaps millions of dollars more, to IMC. He alleges that as guarantor he will be obligated to pay money in the future, which amounts to a present injury sufficient to confer standing. In support of these claims, he relies upon his own supplemental affidavit to show that he has expended various sums and incurred other risks because he has been sued both in the District of Columbia and in Jamaica.[15]

Standing to assert a claim or counterclaim, when challenged, requires a showing of actual or threatened injury redressable by the court. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758–59, 70 L.Ed.2d 700 (1982) (citing cases); *see also Sierra Club v. Morton*, 405 U.S. 727, 732, 92 S.Ct. 1361, 1364–65, 31 L.Ed.2d 636 (1972); *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962) ("a personal stake in the outcome of the controversy"). In this case, however, Laufer has not alleged any injuries as the guarantor of the loan that are "real, perceptible, concrete, specific and immediate," but only those that are "conjectural, hypothetical or speculative." *Lee v. District of Columbia Board of Appeals & Review*, 423 A.2d 210, 217 (D.C.1980) (citations omitted). Standing cannot be based on the assertion that someday he may have to pay money to someone as a guarantor. *See United States v. Palmer, supra* note 14; *cf. Debevoise v. Back*, 359 A.2d 279, 280 (D.C.1976) (no taxpayer standing when plaintiff merely "suggested that her tax bills might be reduced" if she were granted relief). Laufer must demonstrate that "unless relief from assertedly illegal actions [is] forthcoming, [his] immediate and personal interests [will] be harmed"; he may not "rely on little more than the remote possibility, unsubstantiated by allegations of fact," that eventually he may have to make good on his guarantee. *Warth v. Seldin*, 422 U.S. 490, 507, 95 S.Ct. 2197, 2209, 45 L.Ed.2d 343 (1975); *see also Burleson v. United Title & Escrow Co.*, 484 A.2d 535, 537 (D.C.1983) (standing requires that the suing party "be injured in fact by the conduct of the other party");

---

ship is concentrated in the hands of one person, it does not alter the fact that title to the corporate property is vested in the corporation and not in the owner of its stock." *Office of People's Counsel v. Public Service Commission*, 520 A.2d 677, 682 (D.C.1987) (citations omitted).

**14.** Laufer asserts that the wrongs were committed against him as an individual and not as a shareholder of the corporations. He agrees with Westminster that he cannot rely on his shareholder status to advance a claim for wrongs committed against either corporation. *See, e.g., Stevens v. Lowder*, 643 F.2d 1078, 1080 (5th Cir.1981); *United States v. Palmer*, 578 F.2d 144, 145–146 (5th Cir.1978); *Kauffman v. Dreyfus Fund, Inc.*, 434 F.2d 727, 732 (3d Cir.1970), *cert. denied*, 401 U.S. 974, 91 S.Ct. 1190, 28 L.Ed.2d 323 (1971).

**15.** In his affidavit of September 5, 1985, Laufer stated that he had been forced to expend more than $40,000 in attorney's fees and costs and more than $30,000 in travel expenses "for various trips to and from Jamaica and London which he would not have had to expend but for the fraud of Westminster." In addition, he had become obligated for more than $90,000 "in order to protect his interests, and namely his liability as a guarantor...." Finally, he said that he had made personal loans to FSI totaling $1,476,402, and that the value of his stock in FSI had declined by more than $900,000. These and other financial traumas, he said, were all "a direct result of the fraud of Westminster as aforesaid...."

*Consumer Federation of America v. Upjohn Co.*, 346 A.2d 725, 728 (D.C.1975) (standing requires "individualized proof" of both the fact and the extent of injury). On the present record we hold that Laufer cannot assert standing based on his status as a guarantor.

The one respect in which the amended counterclaims differed from the originals was in the addition of an allegation that Laufer "was personally damaged by ... the tremendous cost of litigation," which presumably includes the $40,000–plus in attorney's fees and the $30,000–plus in travel expenses to which his supplemental affidavit refers. We need not decide whether this allegation was sufficient to confer standing, however, because there is a more fundamental reason why his counterclaims are totally barred. To that reason we now turn.

## B. *Res Judicata*

■ "Under the doctrine of *res judicata*, a prior judgment on the merits raises an absolute bar to the relitigation of the same cause of action between the original parties or those in privity with them." *Goldkind v. Snider Brothers, Inc.*, 467 A.2d 468, 473 (D.C.1983) (citations omitted). This doctrine bars "relitigation of not only those matters *actually* litigated but also those which *might have been* litigated in the first proceeding." *Id.* at 473 n. 10 (citations omitted; emphasis in original); *see Federated Department Stores, Inc. v. Moitie*, 452 U.S. 394, 398, 101 S.Ct. 2424, 2427–28, 69 L.Ed.2d 103 (1981). Laufer alleged in his counterclaims that he was induced by Westminster's fraudulent representations to enter into the contract with IMC, and that he therefore suffered damages. If these allegations were true, they would have constituted a defense to Westminster's original claim on the brokerage contract, which was the basis of the English litigation. We hold, therefore, that because the issue of Westminster's alleged fraud was one which might have been litigated in the original action before the High Court of Justice, the English judgment raises an absolute bar to Laufer's counterclaims based on the same alleged fraud. *Cromwell v. County of Sac*, 94 U.S. (4 Otto) 351, 352–353, 24 L.Ed. 195 (1876).[16] To allow the defenses that Laufer now seeks to raise in the guise of counterclaims would impermissibly "undercut the validity of the [English] judgment ... and permit him to relitigate the case *de novo.*" *Bank of Montreal v. Kough*, 612 F.2d 467, 473 (9th Cir.1980).[17]

Laufer asserts that *res judicata* does not bar his counterclaims because he "was not aware of any direct proof of the existence of the fraud by Westminster until late April or early May 1985," after the English

**16.** The Supreme Court in *Cromwell* stated that a judgment on the merits of a claim "is conclusive as to the validity of the [claim] and the amount due upon it, although it be subsequently alleged that perfect defences actually existed, of which no proof was offered.... If such defences were not presented in the action, and established by competent evidence, the subsequent allegation of their existence is of no legal consequence." *Cromwell v. County of Sac, supra*, 94 U.S. (4 Otto) at 352. Thus a judgment is conclusive not only as to every defense actually presented, but also as to every one which might have been presented. *Id.* at 353; *accord, e.g., Goldkind v. Snider Brothers, Inc., supra*, 467 A.2d at 473 n. 10.

**17.** We find *Bank of Montreal v. Kough* to be a particularly apt precedent because it involved the enforcement of a foreign judgment, which had been obtained by default in British Columbia. When the plaintiff bank brought an action on the judgment in California, Kough alleged in a series of counterclaims that the bank had made fraudulent misrepresentations which induced him to enter into a contract guaranteeing the debts of a corporation, and that it had intentionally interfered in a contractual relationship so as to cause the corporation to default on its debts, thereby making Kough liable on his guarantee. In affirming the trial court's dismissal of the counterclaims, the Ninth Circuit held that they were all "so intimately intertwined with plaintiff's cause of action on the guarantee agreement that they ... were *res judicata.*" *Bank of Montreal v. Kough, supra*, 612 F.2d at 472.

The same can be said of Laufer's counterclaims in the instant case. He asserts that they presented "a totally separate cause of action for fraud" because the earlier action in England was on the brokerage contract, whereas the counterclaims sounded in tort, seeking damages for fraud and breach of fiduciary duty. We reject this assertion. *See Samuel Blanken & Co. v. Goldblatt*, 125 U.S.App.D.C. 296, 371 F.2d 949 (1966).

judgment had been entered. Thus, he argues, he had no claim against Westminster which could have been litigated in England. His own affidavit refutes this assertion. Laufer's affidavit of June 29, 1985, states that in the early summer of 1983 he learned that Prince Alfonso Hohenlohe had sold seventy-five percent of his interest in the Marbella Club at Marbella, Spain, to "an Arab group." Then,

> *beginning in 1984*, it began to appear that IMC was hopelessly inept at managing Dragon Bay; the requisite financial statement being untimely supplied, and then in such incomplete form as to be virtually worthless, the hotel having less than a fifteen percent (15%) occupancy, there being no comprehensive marketing plan, and the level of service being substandard. [Emphasis added.]

The affidavit goes on to say that "in the late Fall of 1984" Laufer began to realize that he had been "grossly misled by ... IMC (having received a copy of a partial financial statement of IMC revealing it had no assets, owned no hotels and was managing but one Marbella Club, namely at Sharjah, which was losing money)...."

Finally, and most significantly, the affidavit says that "[u]pon information and belief, at all relevant times subsequent to the execution of the original agreements between [IMC and Laufer]"—*i.e.*, since March 30, 1983, at the latest—Westminster "continued to mislead and/or failed to inform [Laufer] as to the true status of [IMC], and instead pursued a course of conduct which it still follows, of acting in concert with IMC to portray the latter as a substantial experienced manager of luxury resort hotels." The next paragraph states, again "upon information and belief," that "since October 1984 [Westminster] has been acting in concert with IMC to force the premature private foreclosure sale of Dragon Bay desired by IMC, and in connection therewith, upon information and belief, has taken the following overt acts," which are then set forth in the next several paragraphs. Those alleged overt acts included:

(a) That although [Westminster] appeared satisfied with the Agreement dated July 21, 1983, and [Westminster's] construction thereof, providing namely for incremental payments of the agreed upon debt from the sales of villas at Dragon Bay, and indeed, accepting of such payments, [Westminster], without any advance notice or demand to [Laufer], filed a suit in the Queen's Bench Division, High Court of Justice, London, England, in October 1983, claiming the entire balance. This suit was timed to coincide with intense negotiations between [Laufer] and IMC then occurring in Washington, D.C., thereby inhibiting [Laufer's] ability to devote any substantial attention to said suit.

\* \* \* \* \* \*

(d) That upon information and behalf [Westminster] and IMC coordinated the filing of [Westminster's] London law suit to increase the leverage against [Laufer], the *quid pro quo* to [Westminster] being that IMC would assist [Westminster] in obtaining payment of its claim.

Thus the affidavit shows that by the fall of 1984 at the latest (and perhaps as early as the spring of 1983) Laufer had knowledge of IMC's shortcomings, of Westminster's awareness of them, and of Westminster's alleged collusion with IMC against him. This was sufficient to put him on notice of the supposed fraud by Westminster, so that he should have raised that fraud as a defense to Westminster's action on the contract in the High Court of Justice in London. The judgment of that court in April 1985 now stands as a bar to any assertion of fraud in the instant litigation in the form of a counterclaim, under well settled principles of *res judicata*.

*Affirmed.*