**ARTHUR YOUNG & COMPANY,**
Appellant,

v.

**Vernell M. SUTHERLAND, Appellee.**

No. 89–CV–777.

District of Columbia Court of Appeals.

Argued Jan. 15, 1991.
Decided Aug. 26, 1993.

Carl D. Liggio, with whom Geoffrey P. Gitner, Richard B. Nettler, Paul J. Ostling, and Elizabeth B. Healy were on the brief, for appellant.

Douglas B. Huron, with whom James H. Heller was on the brief, for appellee.

Before FERREN, TERRY, and STEADMAN, Associate Judges.

TERRY, Associate Judge:

Vernell Sutherland sued her former employer, Arthur Young & Company (hereafter "Young" or "Arthur Young"),[1] seeking damages for employment discrimination in violation of the District of Columbia Human Rights Act, D.C.Code §§ 1–2501 *et seq.* (1992) ("DCHRA"), for retaliation against her for pressing her claim of discrimination, also in violation of the DCHRA, and for breach of contract. Young counterclaimed for breach of contract[2] and abuse of process. After a lengthy trial, the jury returned a verdict in favor of Sutherland on all three of her claims and on Young's abuse of process counterclaim. It awarded her $175,000 for lost income and $15,000 for "embarrassment, humiliation, and indignity" on the discrimination and retaliation claims, $34,300 on her breach of contract claim, and $75,000 in punitive damages. The jury found for Young on its breach of contract counterclaim and awarded it $57,875 in compensatory damages. Young filed a motion for new trial or, in the alternative, judgment notwithstanding the verdict or remittitur. The trial court denied the motion, and Young noted this appeal. Although this case presents a multitude of

---

1. Arthur Young & Company was formerly one of the so-called "Big Eight" accounting firms in the United States. Since the time of trial Arthur Young has merged with another Big Eight firm, Ernst & Whinney, to become Ernst & Young.

2. The two breach of contract claims involved different contracts. Sutherland's claim was based on Young's alleged breach of an oral agreement to extend the time for payment of a promissory note for a year, from March 1987 to March 1988. Young's counterclaim was for breach of the contract contained in the note itself, *i.e.,* for failure to pay the note when it fell due. (Young denied that the due date had been extended.)

difficult issues, we find no reversible error and accordingly affirm the judgment.[3]

## I. THE EVIDENCE AT TRIAL

Arthur Young hired Sutherland in January 1986 as a manager[4] to head its Advance Office Systems Group in Houston, Texas. Sutherland's immediate supervisor in Houston was Stephen Greer, a partner in the firm. In April 1986 Greer told Sutherland that he would support her promotion to principal because he felt she was doing the work of a principal. In the same month Greer gave her an "excellent" performance evaluation. Sutherland was not promoted, however, because other partners in the Houston office felt that she had been with the firm for too short a time. Sutherland testified that Greer told her she would in all likelihood be promoted the following year.

In July 1986 Sutherland learned that Young's Office of Strategic Services (OSS) in Reston, Virginia, was forming a new group to provide computer training services to its clients and was seeking someone to manage that group. Sutherland was interested in that position, so she traveled to Reston to be interviewed by David Wilson, the partner in charge of the National Education Systems (NES) program at OSS, and Joseph Camardese, the partner in charge of the Instructional Technology Group (ITG), a unit within NES. Sutherland told both men that she hoped to be promoted to principal the following year. They offered her a position as manager and practice director of ITG, and she accepted the offer, believing that the new job would increase her chances of being promoted to principal and eventually to partner.

As Sutherland began preparing for her move from Texas to the Virginia suburbs of Washington, she became concerned about the higher cost of living in the Washington area. She realized that the proceeds from the sale of her home in Houston would not be sufficient both to pay off the outstanding mortgage and to enable her to make a down payment on a new home in Reston. She therefore asked that her acceptance of the new job be made contingent upon Young's giving her a short-term "bridge" loan to cover the difference. Young had a policy of making such loans to its employees and agreed to lend her $113,000. On October 30, 1986, Sutherland executed a promissory note for that amount, to be secured by a second mortgage on seventy-five acres of land that she owned in New Hampshire and by a second deed of trust on the home in Reston. The loan agreement provided that the loan would mature on either the date of sale of the New Hampshire property[5] or March 17, 1987, whichever occurred earlier, and would begin to accrue interest only if it remained unpaid after the maturity date.

In September 1986 Sutherland began working at ITG, where her immediate supervisor was Mr. Camardese.[6] Later that year the ITG office moved to the District of Columbia. In early February 1987 Sutherland approached Camardese about her chances of being promoted to principal in April. He told her that, because of the office's poor financial performance, no one would receive a promotion that year and that, in fact, he and Mr. Wilson would both have to take a salary cut.[7] Sutherland

---

**3.** Young does not challenge the judgment in favor of Sutherland on its counterclaim for abuse of process. Sutherland likewise has not cross-appealed from the judgment in favor of Young on Young's breach of contract counterclaim.

**4.** Arthur Young, like many large accounting firms, is a partnership. Below the partners in the firm hierarchy are several tiers of non-partnership positions. A manager, the position that Sutherland held, is two steps down from partner. The position between partner and manager is called "principal."

**5.** Sutherland put her New Hampshire property on the market in early August 1986, hoping to use the proceeds from its sale to pay off the loan.

**6.** Camardese's supervisor, in turn, was David Wilson.

**7.** This statement turned out to be untrue; both men received raises and promotions later that year.

then went to Wilson to discuss her possible promotion. Wilson told her that he could not recommend her for a promotion based on her performance to date, but that she was free to seek support from other Young partners. Although she realized that her chances for a promotion without Wilson's backing were slim, she nevertheless solicited support from other partners with whom she had worked. The evaluations she received in her bid for a promotion were mixed.

At about the same time, Sutherland began to have problems working with Mr. Camardese. She believed that he was not providing her with sufficient support in her efforts to obtain equipment and training for her staff and that his inaction was significantly hampering her group's success and, consequently, her own as well. She met with Mr. Wilson's supervisor, Al Roberts, in an effort to obtain better support from both Wilson and Camardese. As a result of this meeting, Sutherland began reporting directly to Wilson rather than Camardese.

The theory underlying Sutherland's discrimination claim was that Arthur Young had discriminated against her because she was a woman. She introduced evidence which suggested that Young discriminated generally against women in its Reston and Washington offices. This evidence included proof of some patently sexist comments by both Wilson and Camardese. For example, Sutherland testified that Camardese denied overtime payments to one of her female staff members because she "made enough for a woman." There was also evidence that Camardese denied the same staff member's request for meal reimbursements because "she should have been at home cooking." Sutherland testified in addition that Camardese told her she should be "meek and mild" if she wanted to get ahead in the firm. She said that

Wilson told her that she was being "emotional" for protesting the treatment given to her and her staff, and that the firm was having the "same problems with women partners that we used to have with blacks." Concerning the only female principal in the Reston office, Wilson said that "she made a lot of money for a woman." Sutherland also stated that at a going-away party for a male employee there was a cake in the shape of a scantily clad woman, and that the employee made "very derogatory" comments about women while cutting the cake even though there were several women present.[8]

Meanwhile, on March 17, 1987, the loan matured. The New Hampshire property had not yet been sold, and Sutherland had not delivered the promised second deed of trust on her Reston home. The evidence was in dispute as to what Sutherland and Wilson decided to do at this point. Sutherland testified that Wilson agreed, on behalf of Arthur Young, to extend the due date for one year, until March 17, 1988, and to refrain from any effort to collect on the loan during that year. Wilson, on the other hand, testified that he asked Sutherland to begin making payments on the loan and told her it would have to be fully repaid within twelve months. No agreement about the repayment of the loan was ever reduced to writing, and Sutherland never made any payments on the loan.

On April 9, 1987, Sutherland signed a second deed of trust on her Reston home. Her husband, however, refused to sign it, making it unenforceable. On April 16 Mr. Wilson asked Mrs. Sutherland to have her husband sign it. She responded with a letter on April 28, stating that her husband would not sign the deed of trust because it allowed Young to foreclose on the home in the event of a default on the loan, contrary to her husband's understanding that Young had agreed not to foreclose.[9] In the same

8. Young introduced evidence to the effect that many of these statements had been taken out of context, but the jury apparently did not accept that explanation.

9. Wilson testified that he never agreed to such a provision. The loan agreement itself is silent as

to whether Sutherland's husband was obligated to sign this second deed of trust, but we assume, given the centuries-old legal rights that spouses have in real property, that his signature was at least expected, if not required.

letter Mrs. Sutherland wrote that her husband thought Young's treatment of them under these circumstances was "quite likely discriminatory."

On April 28 Wilson and Camardese conducted Sutherland's annual performance review. The evaluation form, which Camardese filled out, listed eleven categories of job skills and allowed performance in each category to be rated "Outstanding," "Competent," "Improvement needed," or "Unsatisfactory." Camardese's evaluation of Sutherland found "Improvement Needed" in three of the eleven categories [10] and ranked her performance as falling between "Improvement Needed" and "Competent" in two other categories.[11] He deemed her performance "Unsatisfactory" in one category,[12] "Competent" in four categories,[13] and somewhere between "Competent" and "Outstanding" in the remaining category.[14] Sutherland believed, and testified, that evaluations with "Improvement Needed" ratings were reserved for employees "on their way out."

On May 4, less than a week later, Wilson told Sutherland that the whole office was moving back to Reston, where it would be restructured, and that her group would become part of a larger group that he would lead. Mr. Camardese in turn would become the head of NES, which meant that everyone in Sutherland's group would then be accountable to Camardese. Sutherland testified that, because of this restructuring and the return of Camardese to a position of authority over her office, she felt "constructively discharged" by Arthur Young that day.

Sutherland submitted a letter of resignation two weeks later, on May 18, 1987. On May 20 she met with Mr. Wilson to discuss her resignation. Wilson testified that he did not ask her then to stay on at the firm because he "had been burned enough" and was tired of quarreling with her about getting her husband to sign the deed of trust. Sutherland and Wilson agreed that their attorneys would work out the payment terms of the note and that they would discuss the matter again later in the week. On May 21, however, Sutherland's attorneys sent a letter to the chairman of Arthur Young in New York alleging that Sutherland was the victim of sex discrimination. The following day, May 22, Wilson sent Sutherland a letter demanding that the loan be repaid in full by June 2, eleven days later.[15] Wilson, Sutherland, and their attorneys conferred by telephone on May 26 regarding repayment of the loan. Significantly, Wilson testified that it was during this conference call that he first became aware of Sutherland's claim of sex discrimination, and that he had not seen the May 21 letter sent by Sutherland's counsel to Young's chairman until May 27, the day after the phone call.

Sutherland filed this suit against Arthur Young on May 28. In her complaint she alleged that she had been denied a promotion as a result of unlawful sex discrimination and that Young had illegally retaliated against her complaints of discrimination by demanding immediate repayment of the loan. She also alleged that Young's demand for immediate repayment constituted a breach of Young's oral agreement to extend the payment term of the loan for a year, from March 1987 to March 1988.

When Sutherland did not tender payment after the demand letter, Young initiated foreclosure proceedings against the New Hampshire property on June 15, 1987.[16]

---

**10.** These categories were "Effective engagement management," "Firm and office activities," and "Personal and professional attributes."

**11.** These categories were "Analytical ability" and "Business positioning in the community."

**12.** "Time control, billing, and collecting."

**13.** "Technical knowledge and skills," "Understanding of clients' business needs," "Development of assistants," and "Continuing education activities."

**14.** "Client contact."

**15.** Wilson testified that he sent this demand letter on the advice of Young's counsel.

**16.** Young also sued in Virginia at the same time to impose a constructive trust on Sutherland's Reston home. That action was stayed by the Virginia court, however, pending the outcome of this litigation.

Sutherland filed a petition in the New Hampshire court to enjoin the foreclosure sale, arguing both that Young had agreed to extend the time for repayment and that the foreclosure suit had been brought in retaliation for her filing of this action in the District of Columbia. At a hearing in New Hampshire, Sutherland's attorney argued that Young had agreed not to seek foreclosure and introduced into evidence, over Young's objection, a copy of the complaint in the instant case. Sutherland herself took the stand and began to testify about the circumstances surrounding her departure from employment at Young. Young's counsel objected, however, and the court, saying that it was "not going to try the discrimination suit here," sustained the objection. Sutherland later testified that she resigned after it became clear that Young was not going to promote her and no longer wanted her at the firm. She said that Young demanded payment of the note in full only a few days after she resigned, even though Mr. Wilson, before demanding such payment, had told her that Young would not foreclose but would wait until she sold the property before seeking payment. Sutherland's attorney argued in summation that the foreclosure should be enjoined because Young had agreed not to foreclose on the property.

The New Hampshire court issued an order on August 10, 1987, denying Sutherland's petition. The order specifically noted that Sutherland was claiming that Young was seeking foreclosure in retaliation for her bringing the instant suit against it and that Young had breached an agreement not to foreclose on the property. The court nonetheless found that Sutherland was in default and ordered foreclosure. It did, however, enjoin Young from conducting a foreclosure sale before September 17, 1987, because "justice requires" that Sutherland be given an opportunity to dispose of the property on her own. Sutherland noted an appeal from this decision, but the New Hampshire Supreme Court declined to consider the appeal. Sutherland ultimately sold the New Hampshire property in July 1988 for $125,000. The proceeds of that sale were used, in part, to repay $66,300.76 of the loan. The remaining balance of the loan, however, was not repaid before trial.

At trial Sutherland maintained that Young refused to promote her because she was a woman, that the discriminatory working conditions in her office made her job intolerable, that as a result she was constructively discharged, and that when she confronted Young with its discriminatory treatment of her, it retaliated by declaring in default the loan it had previously agreed to give her additional time to repay. She introduced statistical evidence suggesting that Young discriminated generally against women at its offices both in Reston and in Washington. She presented evidence, summarized at page 358, *supra,* that both Wilson and Camardese made sexist comments and tolerated sexist conduct and remarks in the workplace by other male employees. She also documented the events relating to Young's efforts to foreclose on her New Hampshire property and her Reston home after she had written a letter to Young's chairman charging that she had been discriminated against by Wilson and Camardese.

The jury was persuaded by Sutherland's proof. It found that she had been discriminatorily denied a promotion, that she had been constructively discharged, and that Young's efforts to foreclose on the New Hampshire and Virginia properties were retaliatory. The jury awarded Sutherland $175,000 for lost income and $15,000 for "embarrassment, humiliation, and indignity" on the discrimination and retaliation claims, $34,300 for Young's breach of the oral agreement to give her an additional year to repay the loan, and $75,000 in punitive damages. The jury also found, however, that Sutherland had breached the loan agreement by failing to repay the loan, and awarded Young damages of $57,875, the amount of the unpaid loan balance plus accrued interest.

## II. THE DISCRIMINATION AND RETALIATION CLAIMS

The essence of Sutherland's discrimination and retaliation claims was that Young

failed to promote her because she was a woman, and that after she complained about this discriminatory treatment, Young retaliated by declaring the loan in default and pursuing its legal remedies against the collateral. It is beyond dispute that such acts, if proven by a preponderance of the evidence to be discriminatorily motivated, violate District of Columbia law. The DCHRA proscribes discriminatory employment practices based on an employee's "race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, family responsibilities, physical handicap, matriculation, or political affiliation...." D.C.Code § 1–2512(a) (1992); *see generally RAP, Inc. v. District of Columbia Commission on Human Rights,* 485 A.2d 173 (D.C.1984). The statute specifically prohibits firing or otherwise "discriminat[ing] against any individual, with respect to [her] compensation, terms, conditions, or privileges of employment, including promotion...." D.C.Code § 1–2512(a)(1). In addition, the statute makes it unlawful "to coerce, threaten, retaliate against, or interfere with any person in the exercise or enjoyment of ... any right granted or protected under this chapter." D.C.Code § 1–2525(a) (1992); *see, e.g., Passer v. American Chemical Society,* 290 U.S.App.D.C. 156, 166, 935 F.2d 322, 332 (1991); *Ravinskas v. Karalekas,* 741 F.Supp. 978, 980 (D.D.C.1990).

### A. The discrimination claim

■ Proof of discrimination in violation of the DCHRA proceeds in three steps. First, the employee must make a *prima facie* showing of discrimination by a preponderance of the evidence. *E.g., United Planning Organization v. District of Columbia Commission on Human Rights,* 530 A.2d 674, 676–677 (D.C.1987); *Atlantic Richfield Co. v. District of Columbia Commission on Human Rights,* 515 A.2d

1095, 1099 (D.C.1986); *RAP, Inc. v. District of Columbia Commission on Human Rights, supra,* 485 A.2d at 176–177. Once that has been done, a rebuttable presumption arises that the employer's conduct amounted to unlawful discrimination. *E.g., Shaw Project Area Committee v. District of Columbia Commission on Human Rights,* 500 A.2d 251, 254 (D.C.1985) (citing cases). The burden then shifts to the employer to rebut this presumption "by articulating some legitimate, nondiscriminatory reason for the employment action at issue." *Atlantic Richfield Co., supra,* 515 A.2d at 1099 (citations omitted); *see generally St. Mary's Honor Center v. Hicks,* —— U.S. ——, ——, 113 S.Ct. 2742, 2746–2747, 125 L.Ed.2d 407 (1993) (describing shift in burden of proof under corresponding federal statute).[17] Finally, if the employer has articulated some legitimate, non-discriminatory reason for the disputed conduct, the burden shifts back to the employee to prove, again by a preponderance of the evidence, that the employer's stated justification for its action "was not its true reason but was in fact merely a pretext" to disguise a discriminatory practice. *Atlantic Richfield Co., supra,* 515 A.2d at 1100 (citations omitted).

■ A *prima facie* case of discrimination in the denial of a promotion normally consists of proof (1) that the plaintiff was a member of a protected class, (2) that he or she was qualified for the promotion, (3) that he or she was rejected upon seeking the promotion, and (4) that a substantial factor in that rejection was the plaintiff's membership in the protected class. *See United Planning Organization, supra,* 530 A.2d at 677 n. 3; *Thompson v. International Ass'n of Machinists,* 614 F.Supp. 1002, 1011–1012 (D.D.C.1985) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668

---

**17.** This court has "often looked to cases construing Title VII [of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (1988),] to aid us in construing the D.C.Human Rights Act." *Atlantic Richfield Co., supra,* 515 A.2d at 1103 n. 6; *accord, e.g., United Planning Organization, supra,* 530 A.2d at 676; *Shaw Project Area Committee, supra,* 500 A.2d at 253. The anti-dis-

crimination provisions of both statutes are substantially similar. *See Howard University v. Best,* 484 A.2d 958, 977 (D.C.1984). From time to time in the course of this opinion, therefore, we shall cite as authority federal cases arising under the federal act in interpreting similar provisions of the DCHRA.

(1973)). In addition, since Sutherland was not fired but resigned from her position, to establish a *prima facie* case she also had to establish that she was constructively discharged by Arthur Young. *E.g., Katradis v. Dav-El of Washington, D.C.,* 270 U.S.App.D.C. 23, 26, 846 F.2d 1482, 1485 (1988). The reason for this additional requirement is that, absent constructive discharge, a worker suffering from discrimination in the workplace has a duty to stay on the job and mitigate damages. *Hopkins v. Price Waterhouse,* 263 U.S.App.D.C. 321, 336, 825 F.2d 458, 473 (1987), *rev'd in part on other grounds,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), *on remand,* 287 U.S.App.D.C. 173, 920 F.2d 967 (1990); *Clark v. Marsh,* 214 U.S.App.D.C. 350, 355, 665 F.2d 1168, 1173 (1981); *Bourque v. Powell Electrical Mfg. Co.,* 617 F.2d 61, 66 (5th Cir.1980); *Halbrook v. Reichhold Chemicals, Inc.,* 735 F.Supp. 121, 125 (S.D.N.Y.1990) (citing cases).

■ "A constructive discharge occurs when the employer deliberately makes working conditions intolerable and drives the employee into an involuntary quit." *Atlantic Richfield Co., supra,* 515 A.2d at 1101. There is, however, "no requirement that the employer intend to force the employee to leave." *Id.* (citations omitted). Working conditions rise to the requisite level of intolerableness if they "would lead a reasonable person to resign." *Id.; accord, e.g., Hopkins v. Price Waterhouse, supra,* 263 U.S.App.D.C. at 335, 825 F.2d at 472;[18] *Clark, supra,* 214 U.S.App.D.C. at 355, 665 F.2d at 1173; *Parrett v. City of Connersville,* 737 F.2d 690, 694 (7th Cir. 1984); *Goss v. Exxon Office Systems Co.,*

747 F.2d 885, 888 (3d Cir.1984); *Pena v. Brattleboro Retreat,* 702 F.2d 322, 325 (2d Cir.1983); *Bourque, supra,* 617 F.2d at 65; *Rosado v. Garcia Santiago,* 562 F.2d 114, 119 (1st Cir.1977). Thus proof of constructive discharge does not require evidence that the employer intended to force the employee to quit. *Hopkins, supra,* 263 U.S.App.D.C. at 335, 825 F.2d at 472. Nor is there any requirement that an employee remain in an "intolerable workplace" for a particular period of time. *Atlantic Richfield Co., supra,* 515 A.2d at 1101 (citing cases).

■ Whether working conditions are so intolerable that a reasonable person is forced to resign, as Sutherland asserted here, is a question for the trier of fact. *E.g., Simpson v. Federal Mine Safety & Health Review Commission,* 268 U.S.App. D.C. 457, 467, 842 F.2d 453, 463 (1988). However, case law demonstrates that "intolerable conditions" sufficient to support a finding of constructive discharge commonly, though not invariably, fall into two broad categories. The first involves working conditions in which the employee is subjected to "a continuous barrage of derogatory comments about ... appearance, behavior, and morality." *Atlantic Richfield, supra,* 515 A.2d at 1101.[19] The second involves working conditions in which the employee "reasonably expected ... opportunities for advancement," but the employer's discriminatory actions or omissions "essentially locked [her] into a position from which she could apparently obtain no relief." *Clark, supra,* 214 U.S.App.D.C. at 356, 665 F.2d at 1174; *see Hopkins, supra,* 263 U.S.App.D.C. at 335–336, 825 F.2d at

---

**18.** In partially reversing the Court of Appeals' first decision in *Hopkins,* the Supreme Court focused primarily on allocating the various burdens of proof and defining the standard of proof ("preponderance" rather than "clear and convincing"). *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). Neither the plurality nor the concurring opinions in the Supreme Court addressed the Court of Appeals' holding on constructive discharge. That part of the latter court's opinion, therefore, remains "the established law of the circuit." *Hopkins v. Price Waterhouse,* 287 U.S.App.D.C. 173, 180, 920 F.2d 967, 974 (1990).

**19.** *See also, e.g., Goss, supra,* 747 F.2d at 888–889 (supervisor asked female plaintiff about her family plans, expressed doubt about her ability to combine a career and motherhood, was verbally abusive, and transferred her to less desirable sales territory); *Held v. Gulf Oil Co.,* 684 F.2d 427, 429 (6th Cir.1982) (female plaintiff was given "the least desirable job," was "constantly subjected to offensive sex-based innuendos," and, unlike her male counterparts, was required to work extremely long hours, unstop clogged toilets, and complete "volumes" of paperwork).

472–473 (finding a constructive discharge where the denial of a promotion was reasonably viewed as "a career-ending action"). At trial Sutherland asserted that the evidence supported a finding of constructive discharge under either of these two theories. The jury found that she had in fact been constructively discharged and awarded her $175,000 in damages for lost income, representing the difference between what she would have earned at Young had she stayed on and been promoted and what she actually earned after resigning.[20]

Young argues on appeal that the evidence was insufficient to support Sutherland's claim of constructive discharge and that the trial court improperly instructed the jury on the law of constructive discharge. We are unpersuaded by either contention.

### 1. *Sufficiency of the evidence*

 Young argues that Sutherland presented insufficient evidence to prove that her resignation amounted to a constructive discharge, and that the trial court should therefore have granted its motion for judgment notwithstanding the verdict. We review the denial of such motions deferentially. Reversal is warranted only if "no reasonable person, viewing the evidence in the light most favorable to the prevailing party, could reach a verdict in favor of that party." *Oxendine v. Merrell Dow Pharmaceuticals, Inc.*, 506 A.2d 1100, 1103 (D.C.1986) (citations omitted); *accord, e.g., Sorrells v. Garfinckel's, Brooks Brothers, Miller & Rhoads, Inc.*, 565 A.2d 285, 291 (D.C.1989) (citing cases). Applying this standard, we hold that there was sufficient evidence from which a reasonable juror could find that Sutherland was constructively discharged.

Stephen Greer, Sutherland's supervisor in Houston, told her a year before she resigned that her chances for promotion to principal the following year were excellent. He based this opinion on the fact that she was already performing at a level commensurate with what was expected of a princi-

pal. In fact, she was told before she left Houston that the main reason she was not promoted to principal in Houston was that she had not been with Young long enough. When she was interviewed by Messrs. Wilson and Camardese for the job in the Reston office, she told them that she had expected to be promoted that year, and they said nothing in reply to suggest that such an expectation was unrealistic. Thus there was evidence that Sutherland subjectively had an expectation that she would be promoted. A trier of fact could find that, viewed objectively, this expectation was not unreasonable.

In addition, there was sufficient evidence from which a jury could find that Young's actions essentially locked her into a position from which she could reasonably expect no relief in the form of a promotion at any time in the foreseeable future. The essence of a claim of constructive discharge is a showing that working conditions (including opportunities for advancement) are such that an employee's only reasonable choice is to resign. The evidence before the jury established at least two plausible reasons for Sutherland to conclude that she had no future with Arthur Young. First, she received a performance rating from Mr. Camardese which was usually reserved for people who were "on their way out." Second, when the office moved back to Virginia from the District of Columbia, she learned that her group would be made part of a larger division headed by Camardese, who in the past had failed to provide her and her staff with necessary logistical support and training. In addition, she offered evidence of efforts by Mr. Wilson to undermine her quest for a promotion (*e.g.*, by soliciting negative comments about her work even though he testified that her performance merited a promotion to principal). When Sutherland told Wilson that she felt the firm did not want her around any more, he did not disagree, as he himself admitted in his testimony.

---

**20.** The amount of this award is not questioned on appeal.

Sutherland also asserted that she was constructively discharged as a result of "aggravating conditions in the workplace which would lead a reasonable person to resign." *Atlantic Richfield Co., supra*, 515 A.2d at 1101. It is not necessary to prove that the employer deliberately created such conditions with an intent to coerce the employee into resigning; "it is sufficient if the employer simply tolerates discriminatory working conditions that would drive a reasonable person to resign." *Hopkins, supra*, 263 U.S.App.D.C. at 335, 825 F.2d at 472. She testified about numerous sexist comments by Wilson and Camardese directed toward her and other female employees, as well as the going-away party with the cake in the shape of a woman and the derogatory comments about women which were made at that party by the guest of honor. Finally, she introduced statistical evidence showing that there were significantly fewer women principals than women managers.

■ "[I]ntolerableness of working conditions is very much a function of the reasonable expectations of the employee, including expectations of promotion or advancement." *Hopkins, supra*, 263 U.S.App.D.C. at 335, 825 F.2d at 472. Thus, while a discriminatory failure to promote, without more, is insufficient to establish a constructive discharge, *see id.* at 336, 825 F.2d at 473; *Irving v. Dubuque Packing Co.*, 689 F.2d 170, 172 (10th Cir.1982),[21] it may be the basis for a finding of constructive discharge if the employee can show that she "reasonably expected . . . opportunities for advancement" and that the employer's discriminatory actions or omissions "essentially locked [her] into a position from which she could apparently obtain no relief." *Clark, supra*, 214 U.S.App.D.C. at 356, 665 F.2d at 1174. In *Hopkins* the court held that the employer's discriminatory failure

to promote the plaintiff could be reasonably viewed by a person in her position as "a career-ending action," and that the failure to promote her, given other indicia of discriminatory animus, therefore "amounted to a constructive discharge." *Hopkins, supra*, 263 U.S.App.D.C. at 336, 825 F.2d at 473. Considering the record in this case, we hold likewise. We hold, specifically, that there was sufficient evidence from which a jury could reasonably find (1) that Arthur Young's failure to promote Sutherland was discriminatory, and (2) that the failure to promote her was "a career-ending action," so that her resignation, viewed in context with the other evidence of discriminatory animus, was actually a constructive discharge. We therefore conclude that the trial court did not err in denying Young's motion for judgment n.o.v.

### 2. The jury instruction on constructive discharge

One of Young's principal arguments is that the trial court erred when it instructed the jury on the law of constructive discharge. In the challenged instruction, the court said:

By constructive discharge the law means that the employer tolerates discriminatory working conditions that would cause a reasonable person to resign. In deciding whether working conditions would cause a reasonable person to resign, you determine whether Ms. Sutherland reasonably expected opportunity for advancement and whether her employer locked her in a position where she could expect no advancement. That is, you determine whether a reasonable person in Ms. Sutherland's position would view it as a career-ending situation.

**21.** *See also, e.g., Wardwell v. School Board of Palm Beach County*, 786 F.2d 1554, 1558 (11th Cir.1986) (humiliation and increased workload suffered by plaintiff after denial of promotion did not result in constructive discharge); *Muller v. United States Steel Corp.*, 509 F.2d 923, 929 (10th Cir.) (reassignment of employee, which removed him from eligibility for promotion, did not amount to constructive discharge), *cert. denied*, 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1975); *Nobler v. Beth Israel Medical Center*, 702 F.Supp. 1023, 1030–1031 (S.D.N.Y.1988) (discriminatory denial of promotion, without more, did not constitute constructive discharge); *Lombardo v. Oppenheimer*, 701 F.Supp. 29, 31 (D.Conn.1987) (reduction or change in job duties did not amount to constructive discharge).

Constructive discharge does not require an employer to have specific intent to force the employee to quit. It is sufficient if the employer tolerates discriminatory working conditions that would drive a reasonable person to resign.

Constructive discharge in the context of a promotion occurs where an employee has reasonable expectations of opportunity to advance and the employer's action essentially locked the employee into the situation from which there is apparently no relief.

... [T]he mere fact of discrimination in promotion is not enough to prove constructive discharge. There must be proof not only of the discriminatory failure to promote, but other indications of a discriminatory animus, that is, an intention of ill will that would cause a reasonable person to see that lack of promotion as a career-ending action.

■■■ Young maintains that this instruction, much of which is taken almost verbatim from *Hopkins*, is flawed in several respects. First, Young argues that it misstates the law by failing to require a finding of "intolerable conditions" in the workplace. We disagree. As the Court of Appeals observed in *Hopkins*, a plaintiff may establish "intolerable" working conditions by proving that the "employer simply tolerates discriminatory working conditions that would drive a reasonable person to resign." 263 U.S.App.D.C. at 335, 825 F.2d at 472. The instruction given here says precisely that. More importantly, in a constructive discharge case based on failure to promote, "intolerable conditions" are principally shown by proof that the employee had a reasonable expectation of advancement and that the employer engaged in some discriminatory conduct which established the lack of promotion as career-ending. *See Clark, supra*, 214 U.S.App.D.C. at 356, 665 F.2d at 1174; *see also Parrett, supra*, 737 F.2d at 694. This instruction, viewed as a whole, sufficiently conveys that aspect of the law as well.

Second, Young asserts that the instruction is confusing because it fails to explain what "intolerable conditions" are and because it confuses the law of discrimination and constructive discharge. We are mystified by this first objection because the instruction does not even use the phrase "intolerable conditions"; thus a definition of that phrase was unnecessary. As to the latter objection—that the instruction confuses the concepts of discrimination and constructive discharge—we again find no infirmity. The instruction clearly states that Sutherland could not establish that she was constructively discharged solely by proving that the denial of her promotion was the result of discrimination. This is an accurate statement of the law. It makes sufficiently clear that proof of discrimination cannot, by itself, be a plaintiff's sole basis for contending that she was constructively discharged. *See Hopkins, supra*, 263 U.S.App.D.C. at 336, 825 F.2d at 474.

■■■ Finally, Young contends that the instruction improperly asked the jury to determine whether Sutherland was constructively discharged from Sutherland's subjective standpoint, rather than the standpoint of a reasonable person in her position. *See, e.g., Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir.1985), *cert. denied*, 475 U.S. 1082, 106 S.Ct. 1461, 89 L.Ed.2d 718 (1986); *Halbrook, supra*, 735 F.Supp. at 125–126; *Nobler, supra*, 702 F.Supp. at 1030. This contention is meritless. The first quoted paragraph of the instruction makes clear that the operative viewpoint is that of a reasonable person, and each paragraph thereafter reiterates that requirement through the use of the word "reasonable." We fail to see what more the trial judge could have said.

### B. *The retaliation claim*

In the trial court Young sought partial summary judgment on Sutherland's retaliation claim. Young maintained that this claim was decided adversely to Sutherland in the New Hampshire foreclosure proceedings and that she was therefore barred from relitigating it. In addition, Young argues that summary judgment was appropriate because it had a legal right to foreclose, and that the fact that it did so could not, as a matter of law, constitute unlawful

retaliation under the DCHRA. The court denied Young's motion on both grounds.[22]

The jury found that Young violated the DCHRA by bringing the foreclosure action in retaliation for Sutherland's complaint to Young's chairman and for filing the instant suit. It awarded Sutherland $34,300 in damages, consisting of $25,000 for the loss in value of the New Hampshire property caused by Young's institution of the foreclosure proceedings, plus $9,300 for the attorneys' fees she incurred in defending the New Hampshire foreclosure suit and the Virginia suit for a constructive trust.[23] Young renews here the arguments it made below, and argues in addition that the court erroneously instructed the jury on the law of retaliation. We address each of these contentions in turn.

### 1. *Res judicata and collateral estoppel*

■■■ Young argues that the trial court erred in denying its motion for partial summary judgment because the issue of retaliation was litigated and decided by the New Hampshire court. To support this contention, Young points to the fact that Sutherland raised the issue in her New Hampshire petition to enjoin the foreclosure, that a copy of the complaint in the instant case was admitted into evidence by the New

**22.** The trial judge noted that Sutherland had attempted to argue retaliation in the New Hampshire case, but that the New Hampshire court had refused to hear her argument. The trial judge also ruled that the fact that Young had a legal right to foreclose on the property did not preclude liability for retaliation if Young foreclosed because Sutherland had asserted a protected right.

**23.** This portion of the damages also represented compensation on Sutherland's claim for breach of contract. The verdict form instructed the jury that it should award such damages if it found that she proved either claim.

**24.** The single reference in the New Hampshire court's order to this contention was that "[t]he plaintiff claims ... that this foreclosure is retaliatory in nature as a result of plaintiff bringing a breach of contract action against defendant."

**25.** Foreclosure is an equitable remedy in New Hampshire. *Meredith v. Fisher,* 121 N.H. 856,

Hampshire court, and that the court made note of her argument in its order.[24]

"Under the doctrine of *res judicata,* a prior judgment on the merits raises an absolute bar to the relitigation of the same cause of action between the original parties or those in privity with them." *Goldkind v. Snider Brothers, Inc.,* 467 A.2d 468, 473 (D.C.1983) (citations omitted). Moreover, this doctrine "bars relitigation of not only those matters *actually* litigated but also those that *might have been* litigated in the first proceeding." *Id.* at 473 n. 10 (citations omitted; emphasis in original); *accord, e.g., Laufer v. Westminster Brokers, Ltd.,* 532 A.2d 130, 136 n. 16 (D.C.1987). We therefore must determine whether Sutherland's efforts to interject retaliation as an equitable defense to Young's New Hampshire foreclosure suit precluded her from asserting it as a claim under the DCHRA in this case. We conclude that it did not.

A review of the New Hampshire pleadings, the transcript of the hearing held on Sutherland's petition, and the court's order reveals that the DCHRA retaliation claim was not addressed in the New Hampshire court. Sutherland attempted to argue, solely by way of an equitable defense, that Young's foreclosure was retaliatory and therefore should be enjoined as a matter of equity.[25] However, at no point did Suther-

857–58, 435 A.2d 536, 537 (1981). New Hampshire courts have the equitable power to enjoin a foreclosure if the equities of the situation warrant an injunction. *Ruotolo v. Benjamin Franklin Corp.,* 122 N.H. 149, 441 A.2d 1185 (1982). In addition, New Hampshire adheres to the age-old precept that equitable relief will be denied if the party seeking it "comes to the court with unclean hands." *Noddin v. Noddin,* 123 N.H. 73, 76, 455 A.2d 1051, 1053 (1983) (citation omitted). This means that a court of equity will not "lend its aid in any manner to one ... who has been guilty of unlawful or inequitable conduct in the matter with relation to which he seeks relief." 30A C.J.S. *Equity* § 102, at 305 (1992) (footnote omitted). For the purposes of this appeal, we assume that seeking foreclosure in retaliation for the filing of a sex discrimination claim would dirty the hands of the foreclosing party and could, in the court's discretion, disentitle that party to equitable relief. *See Cornwell v. Cornwell,* 116 N.H. 205, 209, 356 A.2d 683, 686 (1976); *Nashua Hospital Ass'n v. Gage,* 85 N.H. 335, 342–344, 159 A. 137, 141 (1932).

land contend that Young's efforts to foreclose on the New Hampshire property gave rise to a claim under the DCHRA. In fact, the New Hampshire trial judge made it abundantly clear that, even were Sutherland so inclined, he would not allow her to litigate her DCHRA claims in the foreclosure proceeding.[26] Thus, since her retaliation claim was not reduced to a judgment in New Hampshire, and since it cannot be said that permitting her to litigate it below "impermissibly 'undercut the validity of the [New Hampshire] judgment ... and permit[ted her] to relitigate the case *de novo*,'"[27] this claim was not barred by *res judicata*.

■ Similarly, Young argues that the New Hampshire court's refusal to enjoin the foreclosure implied that the court found, as a factual matter, that the attempted New Hampshire foreclosure was not retaliatory. Therefore, Young says, Sutherland was collaterally estopped from relitigating that factual question in this case, and her DCHRA retaliation claim should have been dismissed because she was estopped from asserting the factual predicate to that claim: that the filing of the foreclosure suit was a retaliatory act. We disagree. The New Hampshire court refused to hear any evidence on this question, and its order contains no findings on the issue. It is hornbook law that the doctrine of collateral estoppel is applicable only when "issues or facts [have been] actually litigated and necessarily decided in an earlier proceeding based upon a different cause of action." *Goldkind, supra,* 467 A.2d at 473 (citations omitted). Since the retaliation issue was not "actually liti-

gated" in New Hampshire, we hold that it is not barred now by collateral estoppel. Even assuming that there may be some doubt about whether the issue was actually litigated, we hold further that Young did not meet its "considerable" burden of demonstrating that it was in fact decided in the New Hampshire proceeding. *See Halicki v. United States,* 614 A.2d 499, 502 (D.C. 1992).

### 2. The "legal right" to foreclose

■ Young argues next that, since it had a legal right to foreclose on the property which served as collateral for the loan, its efforts to do so could not, as a matter of law, constitute retaliation prohibited under the DCHRA. We reject this argument as well. D.C.Code § 1–2525(a), part of the DCHRA, makes it unlawful "to coerce, threaten, retaliate against, or interfere with any person in the exercise or enjoyment of ... any right granted or protected under [the DCHRA]." *See Schoen v. Consumers United Group, Inc.,* 670 F.Supp. 367, 373–377 (D.D.C.1986). The statute contains no safe harbor for otherwise lawful acts done for an improper retaliatory purpose. *See Atlantic Richfield Co., supra,* 515 A.2d at 1101 (threatening employee that "she would never work in the District of Columbia again if she pressed her discrimination claim" amounted to unlawful retaliation under section 1–2525(a)).

Federal courts interpreting the analogous anti-retaliation provisions of Title VII of the Civil Rights Act,[28] to which we look for guidance in interpreting our local statute,[29] have held that the employer's filing

---

**26.** The judge told Sutherland's counsel, "I'm not going to try the discrimination suit here." It could be argued—although we need not decide the point here—that this remark may have been sufficient in itself to reserve Sutherland's right to maintain her DCHRA retaliation claim below. *See, e.g., Washington Medical Center v. Holle,* 573 A.2d 1269, 1281 (D.C.1990).

**27.** *Laufer, supra,* 532 A.2d at 136 (quoting *Bank of Montreal v. Kough,* 612 F.2d 467, 473 (9th Cir.1980)).

**28.** To establish a *prima facie* case of unlawful retaliation under Title VII, a plaintiff must

show: (1) that he or she engaged in an activity protected by the statute; (2) that the employer engaged in conduct having an "adverse impact" on the plaintiff; and (3) that this conduct was causally related to the plaintiff's exercise of protected rights. *Passer v. American Chemical Society, supra,* 290 U.S.App.D.C. at 165, 935 F.2d at 331. The showing required under section 1–2525(a) is substantially the same. *See Goos v. National Ass'n of Realtors,* 715 F.Supp. 2, 3 (D.D.C.1989) (applying Title VII analysis to the DCHRA).

**29.** See note 17, *supra*.

of a lawsuit in retaliation for an employee's complaints of discrimination violates the anti-retaliation provisions of Title VII. *E.g., EEOC v. Levi Strauss & Co.,* 515 F.Supp. 640, 643 (N.D.Ill.1981) ("A literal reading of the [anti-retaliation] statute obviously outlaws all retaliatory acts including lawsuits filed in state tribunals" (citations omitted)); *EEOC v. Virginia Carolina Veneer Corp.,* 495 F.Supp. 775, 777–778 (W.D.Va.1980), *appeal dismissed sub nom. Cassidy v. Virginia Carolina Veneer Corp.,* 652 F.2d 380 (4th Cir.1981). Under these Title VII decisions,[30] the fact that the employer may have a valid legal claim does not preclude the employee from establishing that the employer's motive in asserting the claim was impermissible retaliation. *Levi Strauss, supra,* 515 F.Supp. at 644 (even though employer had a legal right to bring the lawsuit, allegation of employer's retaliatory motive is sufficient to defeat employer's motion to dismiss). We agree with these federal cases and apply their rationale here to the DCHRA. We hold, specifically, that the employer's filing of a lawsuit in retaliation for the employee's complaints of discrimination is a violation of D.C.Code § 1–2525. Whether the employer had such a retaliatory motive is a question of fact for the jury (or the judge in a non-jury trial), and, like other types of claims in which motive or intent is in issue, is not well suited to disposition on a motion for summary judgment. *See Spellman v. American Security Bank,* 504 A.2d 1119, 1122 (D.C.1986); *Willis v. Cheek,* 387 A.2d 716, 719 (D.C. 1978); *Attorney General v. Irish People,*

*Inc.,* 254 U.S.App.D.C. 229, 233, 796 F.2d 520, 524 (1986).

For these reasons we affirm the trial court's denial of Young's motion for partial summary judgment on the retaliation claim.

### 3. *The jury instruction on retaliation*

■ A plaintiff establishes a *prima facie* case of retaliation under D.C.Code § 1–2525(a) by showing (1) that he or she was engaged in a statutorily protected activity, (2) that his or her employer took an adverse action, and (3) that there was a causal relationship between the protected activity and the adverse action. *See McKenna v. Weinberger,* 234 U.S.App.D.C. 297, 304, 729 F.2d 783, 790 (1984) (footnote omitted) (stating applicable law under Title VII of the Civil Rights Act); *Goos, supra* note 28, 715 F.Supp. at 3 (applying Title VII analysis to the DCHRA). "The causal connection ... may be established by showing that the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity." *Mitchell v. Baldrige,* 245 U.S.App.D.C. 60, 66, 759 F.2d 80, 86 (1985) (footnote omitted).[31]

Young is correct in asserting that, once the plaintiff presents a *prima facie* case of retaliation, the burden shifts to the employer to show a legitimate, non-retaliatory reason for the contested action. *Goos, supra* note 28, 715 F.Supp. at 3. It is undisputed that Young presented evidence of a legitimate business reason for its decision to

---

**30.** In some cases involving other anti-retaliation statutes, not related to unlawful discrimination, federal courts have ruled differently. *See Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U.S. 731, 744, 103 S.Ct. 2161, 2170, 76 L.Ed.2d 277 (1983) (holding that "[t]he filing and prosecution of a well-founded lawsuit may not be enjoined [under the anti-retaliation provisions of the National Labor Relations Act], even if it would not have been commenced but for the plaintiff's desire to retaliate against the defendant for exercising rights protected by the Act"); *Martinez v. Deaf Smith County Grain Processors, Inc.,* 583 F.Supp. 1200, 1209 (N.D.Tex.1984) (reaching same result under the Fair Labor Standards Act). We need not decide how or whether these cases can be reconciled with the

contrary precedents under Title VII, leaving that task instead to the federal courts.

**31.** Although most of the cases on retaliation involve retaliatory personnel actions, such as firing or demotion, the prohibitions of the statute are not limited to retaliatory actions affecting an employee's job status. Section 1–2525(a) provides very broad protection against retaliation of any kind:

It shall be an unlawful discriminatory practice to ... retaliate against ... any person in the exercise or enjoyment of, or on account of having exercised or enjoyed ... *any right* granted or protected under this chapter [the DCHRA].

[Emphasis added.]

foreclose on the New Hampshire property. Since Young made this showing, the burden shifted back to Sutherland to prove, by a preponderance of the evidence, that Young's explanation for its action was merely a pretext for what was really a retaliatory act.

The trial court instructed the jury on the evidence necessary to support a claim of retaliation. It then gave the following instruction:

Now, as in the discrimination claim, Ms. Sutherland in this case may prove retaliation by direct or circumstantial evidence. Therefore, you may consider the nature of the acts themselves, the timing of the action, that is, how close it was in time to the exercise of protected rights and the claimed retaliation, and you may consider the reasons given for taking the action.

You decide whether Arthur Young knew about the discrimination claim before it sought to collect. You decide if the plaintiff has proved that Arthur Young was collecting a legal debt for the purpose or because she exercised a protected right.

In dealing with ... causal connection, I would instruct you that ... causation means something was a substantial contributing factor. The law recognizes more than one reason for an action. You, however, determine if protected activity, that is, the discrimination claim, was a substantial contributing factor in Arthur Young's decision to collect the debt. It follows, therefore, that even though Arthur Young had a legal right to collect the note, plaintiff may establish her retaliation claim if she proves by a preponderance of the evidence that retaliation was a substantial factor in the decision. Therefore, you are determining if in this case has Ms. Sutherland proved

by a preponderance of the evidence that she was engaged in a protected activity under the Human Rights Act when she claimed discrimination and filed suit.

Second, that Arthur Young took action which disadvantaged her.

And third, there was a causal connection between the protected activity and the foreclosure action which Ms. Sutherland [*sic*] took.

If she has proved those things by a preponderance of the evidence, you would be able to respond on the verdict form with a verdict for Ms. Sutherland. If, however, she has failed to prove any one of these essential parts of her proof, you would enter a verdict for Arthur Young & Company.

On appeal Young argues that this instruction was inaccurate because (1) it erroneously permitted the jury to find retaliation even if Young had a legitimate business reason for foreclosing, and (2) it failed to require Sutherland to bear the ultimate burden of proving that its proffered business reason was merely pretextual.[32] We see no basis for either complaint.

As we have already discussed, the fact that Young had a legitimate business reason for its decision to foreclose on the New Hampshire property did not necessarily insulate it from liability for retaliation under section 1–2525(a). Thus Young's first objection to the trial court's instruction is plainly without merit because the legal premise upon which it relies is incorrect. Young's second objection, suggesting infirmity in the court's explanation of the respective burdens of proof, is not supported by the language of the instruction. The judge told the jury:

You, however, determine if the protected activity, that is, the discrimination claim was a substantial contributing factor in

---

**32.** Young requested the trial court to give an instruction which read, in pertinent part, as follows:

If the defendant [Young] has produced evidence of any reason other than sex for the acts complained of as retaliatory, then you must find for the defendant on this issue, unless you find—considering all the evidence

in the case—that the plaintiff has proven by a preponderance of the evidence that the reasons given by the defendant were not worthy of belief, and that Arthur Young intentionally retaliated against Ms. Sutherland for filing charges of discrimination.

The court denied Young's request.

Arthur Young's decision to collect the debt. It follows, therefore, that even though Arthur Young had a legal right to collect the note, *plaintiff may establish her retaliation claim if she proves by a preponderance of the evidence that retaliation was a substantial factor in the decision.* [Emphasis added.]

■ This language was sufficient to explain that Sutherland bore the ultimate burden of proving, by a preponderance of the evidence, that Young's efforts to foreclose were improperly motivated, *i.e.*, that, more likely than not, a desire to penalize the assertion of rights protected under the DCHRA "was a substantial contributing factor in Arthur Young's decision" to engage in the challenged acts. The purpose of the instruction, after all, was simply to provide guidance in evaluating the claim. No magic words were required so long as the instruction fairly and accurately informed the jury of the applicable law and the requirements of proof. *See Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 255 n. 8, 101 S.Ct. 1089, 1094 n. 8, 67 L.Ed.2d 207 (1981) ("the allocation of burdens and the creation of a presumption by the establishment of a prima facie case is intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination"); *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978) (method of analyzing discrimination claims by shifting burdens of proof "was never intended to be rigid, mechanized, or ritualistic [but was] merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination"); *cf. Wisconsin Avenue Nursing Home v. District of Columbia Commission on Human Rights*, 527 A.2d 282, 290 (D.C.1987) (Commission's erroneous imposition of burden of persuasion on respondent was harmless because the record established that the proffered non-discriminatory reason was adequately weighed by the fact-finder). We conclude that the instruction was clear enough to serve its purpose and that the trial court was not obliged in addition (or instead) to give the instruction requested by Arthur Young.

## III. THE BREACH OF CONTRACT CLAIM

Young argues that Sutherland was collaterally estopped from asserting her claim for breach of contract (the claimed agreement to extend the due date of the loan for one year and to refrain from foreclosing on the New Hampshire property) because that issue, like her retaliation claim, was decided in the New Hampshire foreclosure proceeding. *See Goldkind, supra,* 467 A.2d at 473 (discussing doctrine of collateral estoppel). Young reasons that since Sutherland alleged in that proceeding that there was a forbearance agreement, but the court nevertheless found her in default and only temporarily enjoined the foreclosure, she was collaterally estopped from relitigating this issue upon which her breach of contract claim was predicated. Accordingly, Young maintains, the trial court erred in refusing to direct a verdict in its favor on this claim.

We need not decide this point. It is undisputed on appeal that the pecuniary damages flowing from Sutherland's retaliation claim and from this breach of contract claim were identical, namely, the adverse impact of the foreclosure suit on the value of the property, plus attorneys' fees. Since we have concluded that the judgment with respect to the retaliation claim must be affirmed, the award of damages would remain undisturbed even if we were to conclude that the trial court erred in submitting the breach of contract claim to the jury.

## IV. PUNITIVE DAMAGES

### A. *The availability of punitive damages under the District of Columbia Human Rights Act*

Young argues that punitive damages are not available under the DCHRA. Whether punitive damages may be awarded under the DCHRA is an issue of first impression

in this court.[33] Young contends that since the DCHRA is modeled on Title VII of the federal Civil Rights Act, which does not allow punitive damages, this court should therefore hold that the DCHRA likewise does not permit an award of punitive damages. The premise of this argument is only partially correct; Title VII is not the only source of the DCHRA. We conclude that the Council of the District of Columbia, in enacting the DCHRA, intended to include punitive damages in the arsenal of available remedies for discrimination.

We look first at the DCHRA itself. A person suffering discrimination may either pursue administrative remedies before the District of Columbia Office of Human Rights (OHR), D.C.Code § 1–2544, or bring a private action in court, D.C.Code § 1–2556.[34] If the person elects to file a claim with the OHR, the OHR may award compensatory damages and attorneys' fees, but not punitive damages. D.C.Code § 1–2553(a).[35] If the person files a private civil action in the Superior Court, however, the court "may grant such relief as it deems appropriate, *including, but not limited to,* such relief as is provided in § 1–2553(a)." D.C.Code § 1–2556(b) (emphasis added). The italicized language makes clear that the Council intended to allow the courts of this jurisdiction to grant broader relief under the DCHRA than the OHR was authorized to grant.

The legislative history of the DCHRA supports the view that the Council intended that plaintiffs bringing civil actions under the DCHRA be allowed to recover punitive damages in appropriate cases. The DCHRA was enacted by the Council in September 1977 and took effect on December 13, 1977, as D.C.Law 2–38. *See* 24 D.C.Reg. 6038 (1978). Its purpose was to enact as a statute the then-existing Title 34 of the District of Columbia Rules and Regulations (DCRR). COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON PUBLIC SERVICES AND CONSUMER AFFAIRS, REPORT ON BILL No. 2–179, THE HUMAN RIGHTS ACT OF 1977, at 1 (1977) (bill "makes no substantive changes in the text of present Title 34 of the D.C.Rules and Regulations.... Its sole effect is to enact that law as a statute and thus make it a permanent part of the District of Columbia Code"). Thus the current DCHRA is, almost word for word, the text originally adopted as Title 34 of the DCRR. We therefore turn to the legislative history of Title 34.

Title 34 was passed by the District of Columbia City Council (the predecessor of the current Council of the District of Columbia) as the "Human Rights Law," Regulation No. 73–22, on November 17, 1973. *See* 20 D.C.Reg. 345 (1973). Section 35.2(b) of Title 34, which is identical to the present D.C.Code § 1–2556(b), provided that the court hearing a private cause of action under the Human Rights Law may "grant such relief as it deems appropriate...." 34 DCRR § 35.2, 20 D.C.Reg. 363 (1973).

In enacting Title 34, the City Council looked beyond the Civil Rights Act of 1964, including Title VII, to other civil rights legislation enacted by Congress more than 100 years ago:

In patterning specificity, we have looked to the Civil Rights Acts of 1964 and 1968. In our resolve to provide flexibility, we have looked to one of the earliest, and perhaps still the most expansive

---

**33.** This question has arisen occasionally in the United States District Court for the District of Columbia, where the decisions have gone both ways. *Compare, e.g., Green v. American Broadcasting Co.,* 647 F.Supp. 1359, 1366 (D.D.C.1986) (allowing punitive damages under the DCHRA), *with Thompson v. International Ass'n of Machinists, supra,* 614 F.Supp. at 1014 (holding that punitive damages are not available).

**34.** These provisions are mutually exclusive. An aggrieved party may seek relief from either the courts or the OHR, but not both. *Brown v. Capitol Hill Club,* 425 A.2d 1309, 1313 (D.C.

1981). However, nothing in either the *Brown* case or the DCHRA, which *Brown* construed, precludes a person from filing simultaneous or successive complaints with both the Equal Employment Opportunity Commission, a *federal* government agency, and the *District of Columbia* OHR, as Sutherland did here. We reject as unfounded Young's argument to the contrary.

**35.** The OHR may also order the respondent to take "affirmative action," such as hiring or reinstating a person who has been the victim of discrimination.

[pieces of] Congressional civil rights legislation, an 1866 law that states simply that *all* persons shall enjoy the same property rights as any white citizen. We have considered our prerogative to legislate broadly, as did the Congress in 1866. DISTRICT OF COLUMBIA CITY COUNCIL, COMMITTEE ON ECONOMIC DEVELOPMENT, LABOR AND MANPOWER, REPORT ON TITLE 34, HUMAN RIGHTS LAW, at 2 (1973) (emphasis in original). The 1866 law to which the City Council referred was the Act of April 9, 1866, ch. 31, § 1, 14 Stat. 27, now codified as amended at 42 U.S.C. § 1982 (1988). Congress re-enacted portions of the 1866 act in 1870 and added new provisions to it. Act of May 31, 1870, ch. 114, § 18, 16 Stat. 144. One of the new provisions was section 16, the predecessor of what is now 42 U.S.C. § 1981 (1988). We conclude from the Council's stated goal of "legislat[ing] broadly," as well as the specific reference to the 1866 Civil Rights Act, that the 1973 City Council intended the Human Rights Law to encompass all of the remedies available under 42 U.S.C. §§ 1981 and 1982.

Section 1981 affords individuals a "remedy against discrimination in private employment on the basis of race." *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 460, 95 S.Ct. 1716, 1720, 44 L.Ed.2d 295 (1975). A plaintiff pursuing employment discrimination claims under section 1981 "is entitled to both equitable and legal relief, including compensatory damages and, under certain circumstances, punitive damages." *Id.* Since Title VII and section 1981 are not mutually exclusive, the unavailability of punitive damages under the former does not preclude an award of punitive damages under the latter. *See id.* at 459, 95 S.Ct. at 1720.

■ Given the broad statutory language allowing the court to award "such relief as it deems appropriate," D.C.Code § 1-2556(b), read in light of the legislative history which specifically embraces the Civil Rights Act of 1866, we are satisfied that the Council intended to permit punitive damages in cases where they might be appropriate. We therefore hold that punitive damages are available in civil actions under the DCHRA, subject only to the general principles governing any award of punitive damages. *See, e.g., Robinson v. Sarisky*, 535 A.2d 901, 906–908 (D.C.1988).

## B. *The award of punitive damages in this case*

■ It is well established, at least with regard to employment discrimination claims under 42 U.S.C. § 1981, that the mere finding of discriminatory action, without more, will not support an award of punitive damages. *E.g., Ramsey v. American Air Filter Co.*, 772 F.2d 1303, 1314 (7th Cir.1985) (citing cases). A showing of evil motive or actual malice is also required. *Id.* The law governing punitive damages in the District of Columbia courts demands similar proof. *Vassiliades v. Garfinckel's, Brooks Brothers, Miller & Rhoades, Inc.*, 492 A.2d 580, 593 (D.C.1985) ("The purpose of punitive damages is to punish a person for outrageous conduct which is malicious, wanton, reckless, or in willful disregard for another's rights" (citing cases)); *accord, e.g., Zanville v. Garza*, 561 A.2d 1000, 1002 (D.C.1989). "The requisite state of mind need not (and usually cannot) be proven by direct evidence, but may be inferred from all the facts and circumstances of the case." *Robinson v. Sarisky, supra*, 535 A.2d at 906 (citations omitted).

■ Young argues that, even if punitive damages are available under the DCHRA, the evidence at trial was insufficient to support the jury's award of punitive damages in this case because there was no evidence of malice or evil motive. We hold, to the contrary, that the jury's assessment of punitive damages has sufficient support in the record. The actions of Arthur Young had a significant adverse effect on Sutherland's career, her professional reputation, and her financial wellbeing. There was strong evidence before the jury depicting a work environment in which decisions concerning promotions and compensation were improperly made on the basis of sex. Furthermore, the evidence did not merely show that Arthur Young was a rather unpleasant place for women

to work because of the benighted attitude of some of the senior staff. Rather, it established that supervisory personnel both participated in and otherwise condoned working conditions in which women, including Sutherland, were subjected to sexist comments on a regular basis. This offending conduct was not the product of chance, mistake, or ignorance. It manifested itself in one of the most pernicious ways possible: by depriving its victims of the right to work in a decent environment and to earn a fair livelihood based on merit, not gender. We hold that the jury could reasonably find the requisite degree of malice or willfulness to award punitive damages, and accordingly we affirm the jury's award.

## V. OTHER ISSUES

Young challenges several other rulings by the trial court, all of which involved matters within the court's broad discretion. Specifically, Young argues that the trial court abused its discretion by (1) admitting the testimony of Sutherland's statistical expert, who testified that there was a firm-wide disparity between the number of male and female principals at Young, attributable to something other than chance,[36] (2) refusing to allow it to call a witness to rebut Sutherland's denial that she had hired a lawyer to pursue a sex discrimination claim against a former employer, and (3) failing to dismiss Sutherland's complaint on the ground that she had abused the discovery process. We find no abuse of discretion in any of these instances.

■■■ First, it is by now beyond dispute that statistics are relevant evidence in the trial of an employee's discrimination claim against his or her employer. *E.g., Harris v. District of Columbia Commission on Human Rights*, 562 A.2d 625, 632 (D.C.

1989); *Cook v. Boorstin*, 246 U.S.App.D.C. 201, 207, 763 F.2d 1462, 1468 (1985); *Minority Employees at NASA v. Beggs*, 232 U.S.App.D.C. 432, 436, 723 F.2d 958, 962 (1983). We find no abuse of discretion in the trial court's conclusion that the challenged evidence was relevant and therefore admissible.

■■■ Second, extrinsic evidence designed to impeach a witness on a collateral matter is generally inadmissible. *Washington v. United States*, 499 A.2d 95, 101 (D.C.1985). Assuming that the proffered evidence about a prior sex discrimination claim might have been admissible under an exception to this rule, *see Patterson v. United States*, 580 A.2d 1319, 1322 (D.C. 1990), we can find no abuse of discretion in the court's decision to exclude it. The trial was long (five weeks) and hard-fought, and it does not appear that this particular bit of evidence would have had any appreciable effect on the outcome.

■■■ Finally, Young contends that Sutherland's complaint should have been dismissed for gross abuses of the discovery process. Discovery in this case was highly contentious. Young asserts that Sutherland committed gross abuses during discovery such as hiding, destroying, and altering relevant documents it had requested. In fact, at one point Sutherland was sanctioned by the trial court for altering her bank records and was ordered to pay Young's attorneys' fees in connection with its motion to compel production of these records. We have often held, however, that dismissal for discovery abuse is a "most draconian" sanction which "runs counter to a valid societal preference for a decision on the merits...." *Shimer v. Edwards*, 482 A.2d 399, 400–401 (D.C.1984).

---

**36.** We reject Young's contention that even if the trial court correctly admitted the statistical evidence, Sutherland failed to prove that the firm-wide disparity reflected in the statistics has been caused by a particular discriminatory practice. Young's reliance on *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989), for this proposition is misplaced. *Wards Cove* is a disparate impact case, in which the plaintiffs alleged that certain of the defendant's facially neutral employment practices had a disproportionately adverse impact on minorities. Under a disparate impact theory, there is no need to prove discriminatory intent, but there is a need to show a causal connection between the disparity and some identifiable employment practice. *Id.* at 656–658, 109 S.Ct. at 2124–2125. The instant case is a disparate *treatment* case, where the evidence of disparity is introduced to show discriminatory intent. *Wards Cove* has no application to a disparate treatment case.

The trial court must therefore inquire into the reason for the abuse, evaluate the prejudice to the moving party, and consider alternative, less harmful sanctions. *Id.* at 401 (citing cases). In this case the court conducted a hearing on Sutherland's discovery abuses, determined that Young had not been prejudiced, and imposed monetary sanctions instead of ordering dismissal. We find no abuse of discretion in that ruling.

## VI. CONCLUSION

For the foregoing reasons, the judgment is in all respects

*Affirmed.*